UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

AARON L. HIGHTOWER,

                                        Plaintiff,

                                                                1:19-CV-00577

v.
                                                                (GTS/TWD)

GREGORY VEITCH, Chief of Police, Saratoga
Springs Police Department, *et al.*

                                        Defendant.

_____

APPEARANCES:

AARON L. HIGHTOWER
17-A-3545
Plaintiff, *pro se*
Great Meadow Correctional Facility
Box 51
Comstock, NY 12821


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

        The Clerk has sent to the Court for initial review the *pro se* civil rights complaint of

Plaintiff Aaron L. Hightower, brought pursuant to 42 U.S.C. §§ 1981(a), 1983, and 1986.[1]  (Dkt.

No. 1.)  Defendants are Gregory Veitch ("Veitch"), Chief of Police, Saratoga Springs Police

Department ("Police Department"); Police Department Sergeant, Andrew Prestigiacomo

("Prestigiacomo"); Police Department Patrolman, Shawn Thorpe ("Thorpe"); City of Saratoga

_____

        [1]  A claim under 42 U.S.C. § 1986 for neglect to prevent a conspiracy to interfere with
civil rights is contingent upon a plaintiff having a valid conspiracy claim under 42 U.S.C. § 1985.
*See Mian v. Donaldson, Lufkin & Jenrette Securities*, 7 F.3d 1085, 1088 (2d Cir. 1993).  Plaintiff
has not asserted a claim under § 1985 and, therefore, has no claim under § 1986.

Springs; County of Saratoga; and Saratoga County Assistant District Attorney, Matthew Coseo ("Coseo"). *Id.*

Also before the Court are Plaintiff's application for leave to proceed *in forma pauperis* ("IFP Application"), with the requisite signed Inmate Authorization, and motion for appointment of counsel. (Dkt. Nos. 2, 3, and 5.)

## I.    PLAINTIFF'S IFP APPLICATION

A court may grant *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1) (2006). After reviewing Plaintiff's IFP Application, the Court finds that Plaintiff meets this standard. Therefore, Plaintiff's IFP Application (Dkt. No. 2) is granted.

## II.    LEGAL STANDARD FOR INITIAL REVIEW OF COMPLAINT

Even when a plaintiff meets the financial criteria for *in forma pauperis*, 28 U.S.C. § 1915(e) directs that when a plaintiff proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (citations and internal quotation marks omitted). Although extreme caution

2

should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed.  *See, e.g., Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding that a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation." *Id*. In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836 (1994) (citation omitted).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185,

3

191 (2d Cir. 2008) (citation omitted). A *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## III.   COMPLAINT

On December 18, 2015, at approximately 3:40am, Plaintiff, who was on Caroline Street in Saratoga Springs, offered to give a friend and his wife a ride to their motel. (Dkt. No. 1 at ¶ 10.) Upon crossing the street, Plaintiff noticed the headlights of a marked police car at the top of Caroline Street and Broadway looking down onto Caroline Street. *Id*. at ¶ 12. After assuring the right of way, Plaintiff and his friends crossed Caroline Street and entered Plaintiff's vehicle. *Id*. at ¶ 12. As Plaintiff was lawfully operating his vehicle, Thorpe began following Plaintiff's vehicle and ultimately activated his lights directly behind Plaintiff. *Id*. at ¶ 13.

Plaintiff pulled into a motel parking lot and Thorpe approached the Plaintiff's vehicle and began interrogating him. Plaintiff alleges he had violated no laws, and Thorpe had observed nothing giving him probable cause or any justification whatsoever to stop Plaintiff and judged Plaintiff to be guilty of crime because he was an unknown African-American driving a car with Vermont license plates in a predominantly white locale in the County of Saratoga. *Id*. at ¶ 15. Plaintiff produced his valid New York license and registration upon request by Thorpe. *Id.* at ¶ 16.

Thereafter, two more Saratoga Police Officers approached Plaintiff's vehicle and Plaintiff

stepped out of his vehicle in compliance with Thorpe's order.  (Dkt. No. 1 at ¶ 17.)  Thorpe then required Plaintiff to go through a series of tests, allegedly without justification and to vex and harass Plaintiff due to Thorpe's ill-will and hatred towards Plaintiff for being an African-American in a predominantly white community.  *Id*. at ¶ 18.  Plaintiff claims that nothing in Thorpe's unwarranted interrogation of Plaintiff gave him any evidence of probable cause that Plaintiff had violated any New York law or City of Saratoga ordinance.  *Id*. at ¶ 19.  Thorpe returned Plaintiff's license and registration, and while he did not arrest Plaintiff at that time, Thorpe continued to deprive him of access to his vehicle.  *Id*. at ¶ 20.  Plaintiff alleges that Thorpe willingly and knowingly denied him the rights and privileges enjoyed by white citizens of the City of Saratoga and Saratoga County.  *Id*.

Thorpe is alleged to have then threatened to arrest Plaintiff for the actions of his passenger for the purpose of vexing and harassing him further by instilling fear in him through the use of intimidation, due to his ill-will and hatred toward Plaintiff for the pigmentation of his skin.  *Id*. at ¶ 21.  Plaintiff gave Thorpe consent to search his vehicle under duress caused by Thorpe and his ill-will towards Plaintiff, leading Plaintiff to believe if he did not consent, Thorpe would retaliate against him.  *Id*. at ¶ 22.  After the search, Thorpe falsely arrested Plaintiff, placed him in handcuffs, and put him in the back of a police car for transport to the Saratoga Springs Police Department in order to humiliate and harass him for the pigment of his skin.  *Id*.  at ¶¶ 23-24.

While being detained at the police station, Plaintiff was allegedly informed by Thorpe that he had blown under the legal limit on his breathalyzer test but had to have blood drawn to determine who possessed the crack cocaine.  *Id*. at ¶ 25.  When Thorpe told Plaintiff he would

lose his driver's license if he did not sign a consent to have his blood drawn, Plaintiff consented. *Id*. A short while later Thorpe told Plaintiff he had a right to refuse a blood test but it did not matter since Plaintiff had already consented. (Dkt. No. 1 at ¶ 26.)

Thorpe signed and swore to a misdemeanor complaint and three criminal informations against Plaintiff, allegedly knowing his statements were false, in order to satisfy his lust to vex, harass, and humiliate Plaintiff for being African-American in the City of Saratoga. *Id*. at ¶ 28.

Plaintiff alleges that with the advice, consent, and direction of Defendant Prestigiacomo, Thorpe wantonly, maliciously, and without reasonable probable cause, caused Plaintiff to appear in Saratoga City Court on charges of possessing crack-cocaine, driving while intoxicated, driving while his ability was impaired by drugs, and driving on the sidewalk. *Id*. at ¶ 30. Plaintiff was released on $500 cash bond and lost his job delivering pizza as a result of the charges. ¶ 31.

Thorpe did not appear in court on the date of Plaintiff's trial on the charges, and Defendant Coseo, a Saratoga County Assistant District Attorney presented no evidence on the charges against Plaintiff, which were dismissed by the Hon. James E. Doern on July 25, 2016. *Id*. at ¶ 34.

## IV.    ANALYSIS

### A.    County of Saratoga

Plaintiff has named the County of Saratoga as a Defendant in this action as the employer of Defendant Coseo, alleging that Coseo was acting on behalf of the County in his prosecution of Plaintiff, rendering the County liable for his actions. (Dkt. No. 1 at ¶¶ 8-9, 33-34.) However, the Second Circuit has held that a District Attorney is not an officer or employee of the municipality and "when prosecuting a criminal matter a district attorney in New York State, acting in a quasi-

6

judicial capacity, represents the State." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 535-36

(2d Cir. 1993); *see also Baez v. Hennessy*, 853 F.2d. 73, 77 (2d Cir. 1988) (same).  The Court

therefore finds that Plaintiff's claim against the County of Saratoga is frivolous and recommends

that the case be dismissed against the County with prejudice.

### B.    Assistant District Attorney Matthew Coseo

As with the other Defendants, Plaintiff has asserted claims under 42 U.S.C. §§ 1981 and

1983 against Coseo.  Plaintiff alleges that on June 14, 2016, Coseo offered a Bill of Particulars in

the criminal proceeding against Plaintiff with the intent to deceive Judge Doern, knowing that the

information was false and with the intent to maliciously prosecute Plaintiff, and neglected to

dismiss the false criminal charges against Plaintiff even though he knew they were not supported

by the evidence.  (Dkt. No. 1 at ¶¶ 33-34.)

Plaintiff has sued Coseo solely in his official capacity.  (Dkt. No. 1 at ¶ 8.)  Because

Coseo has been sued in his official capacity and is deemed a state official for purposes of the

Eleventh Amendment when involved in prosecuting a criminal matter, Plaintiff's §§ 1981 and

1983 claims against him in his official capacity are barred by the Eleventh Amendment.  See

*Ying Jing Gan,* 996 F.2d at 535-36; *Coger v. Connecticut*, 309 F. Supp. 2d 274, 281 (D. Conn.

2004).

If Coseo had also been sued in his individual capacity, Plaintiff's claims against Coseo

under 42 U.S.C. §§ 1981 and 1983 would be barred by absolute prosecutorial immunity.[2]

"Because a public prosecutor cannot zealously perform the prosecutorial duties of the office if

---

[2] Absolute prosecutorial immunity would apply to Plaintiff's §§ 1981 and 1983 claims.
*See, e.g., Giraldo v. Kessler*, 694 F.3d 161,165 (2d Cir. 2012) (§ 1983); *Silva v. Farrish*, No. 18-
CV-3648 (SJF)(SIL), 2019 WL 117602, at *18 (E.D.N.Y. Jan. 7, 2019) (§ 1981)

compelled to work under the constant threat of legal reprisals, such official is shielded from liability for civil wrongs by the doctrine of absolute immunity." *Hill v. City of New York*, 45 F.3d 653, 656 (2d Cir. 1995). The Second Circuit explained in *Hill*, *id*. at 660-61, that:

> In determining whether absolute immunity obtains, we apply a "functional approach," looking at the function being performed rather than to the office or identity of the defendant. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 268-69 (1993). State prosecutors are entitled to absolute immunity for that conduct "intimately associated with the judicial phase of the criminal process." *Imbler* [*v. Pachtman*, 424 U.S. 409, 430 (1976)]. Thus, a district attorney is absolutely immune from civil liability for initiating a prosecution and presenting the case at trial. *Id*. at 430-31; *Buckley*, 509 U.S. at 273. Such official is also immune for conduct in preparing for those functions; for example, evaluating and organizing evidence for presentation at trial or to a grand jury, *Buckley*, 509 U.S. at 273, or determining which offenses are to be charged. *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 530 (2d Cir. 1993). Prosecutorial immunity from § 1983 liability is broadly defined, covering "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994).

"A prosecutor . . . has absolute immunity in connection with the decision whether or not to commence a prosecution." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976); *see also Broam v. Bogan*, 320 F.3d 1023, 1029 (9th Cir. 2003) ("A prosecutor is absolutely immune from liability for failure to investigate the accusations against a defendant before filing charges."); *Romer v. Morgenthau,* 119 F. Supp. 2d 346, 354 (S.D.N.Y. 2000) (allegation that district attorney acted in bad faith or with malice in prosecuting criminal charges does not defeat a claim of absolute immunity); *Johnson v. City of New York*, No. 00CIV.3626(SHS), 2000 WL 1335865, at *2 (S.D.N.Y. Sept. 15, 2000)[3] (prosecutorial functions that are protected by absolute immunity

---

[3] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

"include the decision to bring charges against a defendant"); *Halpern v. City of New Haven*, 489 F.Supp. 841, 843 (D. Conn. 1980) (prosecutorial immunity found where the prosecutor undertook no independent investigation of the charges and continued prosecution even after finding insufficient evidence to support the charges).

Plaintiff's allegations of wrongdoing by Coseo as alleged in the complaint are "intimately associated with the judicial phase of the criminal process." *See Imbler,* 424 U.S. at 430. Therefore, Coseo would be entitled to absolute judicial immunity even if he were being sued in his individual capacity. Because Plaintiff's claim against Coseo, in either his official or individual capacity, are barred by the Eleventh Amendment and absolute prosecutorial immunity, respectively, the problem cannot be cured by a better pleading. *See Cuoco,* 222 F.3d at 112. Therefore, the Court recommends dismissal of the case against the Coseo with prejudice.

### C.    City of Saratoga Springs

Plaintiff claims the City of Saratoga violated 42 U.S.C. §§ 1981 and 1983, by denying him due process of law and equal protection under the Fourteenth Amendment, when it intentionally, negligently, and with complete indifference for the rights of the plaintiff

> authorized, permitted and tolerated customs, practices and policies written and unwritten, which used racial animosity and intentional discrimination toward African-American citizens which is unconstitutional to be used by members of the Saratoga Springs Police Department and, in particular by defendant Thorpe, defendant Prestigiacomo and defendant Gregory Veitch by failing to:
>
> > a.)  appoint, promote, train and supervise members of the Saratoga Police Department who would protect and enforce the Constitutional rights of the people afforded to them by the United States,
> >
> > b.)  require Gregory Veitch to promulgate procedures and

policies for the use of chemical test that were consistent
with the 4th, 5th 9th and 14th Amendments,

c.)   by permitting a unwritten policy, custom and practice
that gave discretion to members of the Saratoga Springs
Police Department when to activate and deactivate body
worn cameras to exist (unaltered text).

(Dkt. No. 1 at ¶¶ 41-42.)

Pursuant to the standard for establishing municipality liability laid out in *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978), in order to set forth a cognizable claim for municipal liability under § 1983, a plaintiff must plead and prove that a deprivation of his constitutional  rights "was caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell,* 436 U.S. 658); *see also Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) ("The plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer.")  A municipality may be liable for deprivation of constitutional rights under § 1983 for policies or customs resulting in inadequate training, supervision, or hiring when the failure to train, supervise, or hire amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.  *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989).  A plaintiff must also establish a causal connection – an affirmative link– between the policy and the deprivation of his constitutional rights.  *Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985) (plurality opinion).

Plaintiff has failed to identify or allege any facts plausibly showing the existence of a municipal policy or custom of the City of Saratoga authorizing, permitting, allowing, or

tolerating racial animosity and intentional discrimination toward African-American citizens, or any affirmative link between such a policy and Thorpe, Prestigiacomo, or Veitch's actions with regard to Plaintiff.  Furthermore, Plaintiff's conclusory allegations that the City of Saratoga failed to appoint, promote, train and supervise members of the Saratoga Police Department who would protect and enforce the Constitutional rights of the people afforded to them by the United States, without supporting factual allegations, fails to state a *Monell* claim against the City of Saratoga that is plausible on its face.  *See Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell's* requirement that the particular policy be the 'moving force' behind a constitutional violation."  *See also Missel v. County of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) (*Monell* claim requires "factual allegations that would support a plausible inference that the County[ ]'s 'policies' or 'customs' caused . . .  violations . . .  of rights.").  Based upon the foregoing, the Court recommends that Plaintiff's claim under 42 U.S.C. § 1983 be dismissed against Defendant City of Saratoga for failure to state a claim.

The Court also finds Plaintiff has failed to state a claim for violation of § 1981.  A municipality cannot be held liable on a § 1981 claim solely on a theory of *respondeat superior*. *Patterson v. City of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004).  As with a § 1983 *Monell* claim, "the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom."  *See, e.g.*, *Jett v. Dallas Independent School District*, 491 U.S. 701, 733-36 (1989).  As noted above, Plaintiff has failed to allege facts plausibly showing that the actions of Thorpe, Prestigiacomo, or Veitch were performed pursuant to existence of a municipal policy or custom of the City of Saratoga authorizing, permitting, allowing, or tolerating racial animosity

and intentional discrimination toward African-American citizens.

Based on the foregoing, the Court recommends that Plaintiff's claims against the City of Saratoga be dismissed on initial review for failure to state a claim. Mindful of the requirement that a *pro se* complaint should not be dismissed on initial review without giving leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Gomez,* 171 F.3d at 795, the Court further recommends that the dismissal be with leave to Plaintiff to amend his claims against the City of Saratoga.[4]

### D.    Gregory Veitch

At the time of Plaintiff's arrest on December 18, 2015, Veitch was the Chief of Police of the Saratoga Springs Police Department. (Dkt. No. 1 at ¶ 6.) Plaintiff has asserted claims against Veitch under 42 U.S.C. §§ 1981 and 1983. Plaintiff alleges that Veitch:

> intentionally, negligently, and with complete and deliberate indifference of his duties as a final decision-maker and the plaintiff's rights, deprived the plaintiff of this Constitutional Rights by:
>
>> a.)  failing to supervise properly the training and conduct of defendant Thorpe and defendant Prestigiacomo,
>>
>> b.)  failing to enforce the provisions of the Constitution of the United States,
>>
>> c.)  promulgating an unwritten custom, practice and policy

---

[4] Defendants Thorpe, Prestigiacomo, and Veitch have been sued in both their official and individual capacities. Inasmuch as the Court is recommending dismissal of the *Monell* claim against the City of Saratoga, the Court also recommends dismissal of the official capacity claims, with leave to amend against Thorpe, Prestigiacomo, and Veitch. *See Kentucky v. Graham,* 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.") (internal quotation marks and citations omitted).

for use of worn body cameras.

(Dkt. No. at ¶¶ 38-39.)

Plaintiff claims that Veitch's actions deprived him of his right to be "secure in his person against arbitrary and unreasonable decision-making and actions, to equal protections of law and due process of laws in violation of the 4th, 5th, 9th and 14th amendments and 42 U.S.C. §§ 1981(a) [and] 1983." *Id.* at ¶ 40.

Personal involvement in alleged constitutional deprivations is a prerequisite to an award of damages under §1983. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977)); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections . . . in a § 1983 claim") (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)). Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

"Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of a subordinate employee will not suffice to establish the requisite personal

involvement and support a finding of liability" on a § 1983 claim.  *White v. Fischer*, No. 9:09-CV-240 (DNH/DEP), 2010 WL 624081, at * 6 (N.D.N.Y. Feb. 18, 2010) (citing *Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d. Cir. 2009).  Therefore, the Court finds that Plaintiff's vague and conclusory allegation that Veitch failed to properly train and supervise Thorpe and Prestigiacomo fails to state a claim for violation of  42 U.S.C. § 1983.

Plaintiff's additional claims that Veitch failed to enforce the provisions of the United States Constitution, and he promulgated an unwritten custom, practice and policy for use of worn body cameras (Dkt. No. at ¶¶ 38-39), are "'naked assertion(s)' devoid of further enhancement," do not suffice to state a claim. . . and as such fail to state a § 1983 claim against Veitch.  *Iqbal*, 556 U.S. at 678.

The Court also finds that Plaintiff has failed to state a claim against Veitch under § 1981.  The purpose of § 1981 is "to protect from discrimination identifiable classes of people who are subjected to intentional discrimination because of their ancestry or ethnic characteristics."  *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987).  To establish a claim under § 1981, a plaintiff must allege facts supporting the following elements: (1) plaintiffs are members of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities."[5]  *Brown v. City of Oneida*, 221 F.3d 329, 339 (2d Cir. 2000); *see also Albert v. Carovano*, 851 F.2d 561, 571 (2d Cir. 1988) (§ 1981 requires that a defendant's actions have been intentionally and purposefully discriminatory, and plaintiff's race must have been the motivating factor behind the discriminatory act).  It is "well

---

[5]  Section 1981(a) prohibits "intentional racial discrimination" by public or private actors. *Brown v. City of Oneida*, 221 F.3d 329, 339 (2d Cir. 2000).

established" that a plaintiff bringing a 1981 claim must allege with specificity "circumstances giving rise to a plausible inference of racially discriminatory intent." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2d Cir. 1994). "Conclusory allegations" of racially motivated animus are insufficient. *Id*. Plaintiff has failed to allege facts plausibly showing any action by Veitch suggesting an intent on his part to discriminate against Plaintiff on the basis of race.

Based on the foregoing, the Court finds that Plaintiff has failed to state a claim against Veitch under either §§ 1981 or 1983 and recommends that the Plaintiff's claims be dismissed against Veitch on initial review with leave granted to Plaintiff to amend.

### E.   Andrew Prestigiacomo

Defendant Prestigiacomo was a Sergeant in the Saratoga Police Department during the relevant time period. (Dkt. No. 1 at ¶ 5.) Plaintiff alleges that Thorpe submitted reports to Prestigiacomo, and that Thorpe knew the information in the reports was false and contrived maliciously without probable cause or justification, with his sole intent being to procure and justify the unlawful arrest and false imprisonment of Plaintiff, due to Thorpe's hatred and ill-will towards Plaintiff for being an African-American in a predominantly white locale of the City of Saratoga. *Id.* at ¶ 28. Plaintiff further alleges that with the advice, consent, and direction of Prestigiacomo, Thorpe wantonly, maliciously and without reasonable or probable cause, caused Plaintiff to be unlawfully charged with various crimes. *Id*. at ¶ 30.

Plaintiff claims that Prestigiacomo:

> willfully, wantonly, and intentionally with a deliberate indifference for his duties as a supervisor and the rights of the plaintiff as well as his privileges and immunities caused the plaintiff to be deprived of his [right] to be secure in his person, against unlawful and unreasonable searches of his person, not to be deprived of his

> liberty without due process of law, a right to privacy, equal
> protections of law, due process of law and to be free from arbitrary
> unreasonable decision-making, in violation of the 4th, 5th, 9th and
> 14th Amendments of the Constitution of the United States and 43
> U.S.C. §[ ] 1983.

*Id*. at ¶ 37.  The Court finds that Plaintiff's totally naked assertions regarding Prestigiacomo, which are wholly devoid of enhancement, fail to state a claim against him under §§ 1981 and 1983 and recommends that the claims be dismissed against Prestigiacomo on initial review with leave to amend.

### F.    Thorpe

Mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *Sealed Plaintiff,* 537 F.3d at 191, the Court recommends that Defendant Thorpe be directed to respond to Plaintiff's § 1981 claim and his § 1983 Fourth Amendment claims for search and seizure in connection with the search of Plaintiff's vehicle and blood test, false arrest, and malicious prosecution.[6]  The Court expresses no opinion as to whether these claims under §§ 1981 and 1983 can withstand a properly filed dispositive motion.

## V.    MOTION FOR APPOINTMENT OF COUNSEL

Plaintiff has moved for appointment of counsel.  (Dkt. No. 3.)  He has submitted a barebones statement regarding an undocumented, unsuccessful attempt to retain private sector or public interest counsel to represent him.  The Court finds that a more fully developed record would be necessary for an assessment to be made as to whether counsel should be appointed.  *See Hendricks v. Coughlin*, 114 F.3d 390, 392 (2d Cir. 1997) (court must look to the likelihood of

---

[6]  The Court finds that Plaintiff has alleged "circumstances giving rise to a plausible inference of racially discriminatory intent" with sufficient specificity to survive initial review. *See Yusuf*, 35 F.3d at 713.

merit of the underlying dispute in determining whether to appoint counsel).  Therefore, the motion is denied.

The denial is without prejudice so that Plaintiff will not be precluded from making a subsequent motion for appointment of counsel on a more fully developed record in the event the District Court allows the action to proceed.  Any subsequent motion for appointment should include more specific information regarding attempts to retain counsel, including the identity of counsel contacted and copies of letters to and from counsel.  *See Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 173-74 (2d Cir. 1989) (citing *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986)).

**ACCORDINGLY**, it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 2) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 3) is **DENIED WITHOUT PREJUDICE**; and it is hereby

**RECOMMENDED** that Defendant Thorpe be required to respond to the § 1981 and § 1983 Fourth Amendment claims for unreasonable search and seizure, false arrest, and malicious prosecution alleged in Plaintiff's complaint (Dkt. No. 1); and it is further

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be **DISMISSED WITH PREJUDICE** against Defendants County of Saratoga and Matthew Coseo; and it is further

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be **DISMISSED WITH PREJUDICE** against Defendants City of Saratoga, Andrew Prestigiacomo, and Gregory Veitch, **THIRTY (30) DAYS** from the date of the District Court's Decision and Order on this Court's Report-Recommendation, **UNLESS** Plaintiff files an **AMENDED COMPLAINT** that corrects

17

any pleading defects identified in the District Court's Decision and Order within the thirty (30) days; and it is further

**RECOMMENDED** that Plaintiff be instructed by the District Court that: (1) any amended complaint filed by him must be a complete document in and of itself and must include all of his claims against each of the Defendants, including both those claims in the original complaint with regard to which Defendants have been ordered to respond by the District Court, and claims with regard to which Plaintiff has been granted leave to amend by the District Court, with no incorporation of a prior pleading by reference; (2) an amended complaint will supersede Plaintiff's original complaint and become the operative pleading in the case; and (3) any amended complaint filed by Plaintiff must comply with the pleading requirements of Rule 10(b) of the Federal Rules of Civil Procedure that claims be set forth in separately numbered paragraphs, with each paragraph including a single set of circumstances to the extent practicable; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[7] Such objections shall be filed with the Clerk of the

---

[7] If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72.


Dated:   June 21, 2019
         Syracuse, New York

Therèse Wiley Dancks
United States Magistrate Judge

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

**Attorneys and Law Firms**

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

***MEMORANDUM DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kenneth Carl Groves, Sr. ("Plaintiff"),
against numerous employees of New York State or the
Central New York Psychiatric Center ("Defendants"),
are Plaintiff's motion to proceed *in forma pauperis,* his
motion for a temporary restraining order and preliminary
injunction, and his motion for appointment of counsel.
(Dkt.Nos.2, 3, 4.)[1] For the reasons set forth below,
Plaintiff's motion to proceed *in forma pauperis* is granted;
his motion for a preliminary injunction is denied; his
motion for appointment of counsel is denied; Plaintiff's
claims of deliberate indifference to his mental health
needs against Defendants Bill, Carver and DeBroize are
*sua sponte* dismissed with prejudice; Plaintiff's claims
against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged
personal involvement in the August 8, 2011 assault are

*sua sponte* dismissed without prejudice and with leave to
amend in this action in accordance with Fed.R.Civ.P.
15; Sgt. Sweet is *sua sponte* dismissed without prejudice
as a Defendant in this action; the Clerk is directed to
issue summonses, and the U.S. Marshal is directed to
effect service of process on Defendants Davis, Sill, and
Nicolette.

**I. RELEVANT BACKGROUND**
On November 7, 2011, Plaintiff commenced this action
*pro se* by filing a civil rights Complaint, together with
a motion to proceed *in forma pauperis.* (Dkt. Nos.1,
2.)[2] Liberally construed, Plaintiff's Complaint alleges
that the following constitutional violations against him
occurred during his confinement at Central New York
Psychiatric Center ("CNYPC"): (1) Defendants Davis and
Sill used excessive force against him under the Eighth
and/or Fourteenth Amendments; (2) Defendant Nicolette
knew of and failed to take action to protect Plaintiff
from the assault under the Eighth and/or Fourteenth
Amendments; (3) Defendants Bill, Carver, and DeBroize
were deliberately indifferent to his mental health needs
under the Eighth and/or Fourteenth Amendments;
and (4) Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, Bosco, and Hogan failed to "adequately
train the staff under their supervision" and to take
appropriate action in response to the incident. (*See
generally* Dkt. No. 1.) For a more detailed description of
Plaintiff's claims, and the factual allegations giving rise to
those claims, the reader is referred to Part III.B of this
Decision and Order.

**II. MOTION TO PROCEED *IN FORMA PAUPERIS***
Because Plaintiff sets forth sufficient economic need, the
Court finds that Plaintiff may properly commence this
action *in forma pauperis.* (Dkt. No. 2.)

**III. *SUA SPONTE* REVIEW OF PLAINTIFF'S
COMPLAINT**
In light of the foregoing, the Court must now review the
sufficiency of the allegations that Plaintiff has set forth in
his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is
because Section 1915(e)(2)(B) directs that, when a plaintiff
seeks to proceed *in forma pauperis,* "(2) ... the court shall
dismiss the case at any time if the court determines that
—... (B) the action ... (i) is frivolous or malicious; (ii) fails
to state a claim on which relief may be granted; or (iii)

seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

### A. Governing Legal Standard

**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–

61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F.Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id .* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[6]

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the

Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009).[7]

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

**\*4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that

Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

*5 To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).). [8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. [9]

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily

committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading. [10] Rather, this claim is hereby dismissed with prejudice.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [11]

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible

connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997). [12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at \*9 (N.D.N.Y. Feb.4, 2011). [13]

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e) (2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court— to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that*

*may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

## IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at \*3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at \*2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at \*2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at \*2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future

wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof

presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case. [14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that

substantiates his efforts to obtain counsel from the public and private sector.

**\*10  ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is ***GRANTED;*** [15] and it is further

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is ***DENIED;*** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is ***DENIED*** **without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte* ***DISMISSED*** **with prejudice** pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* ***DISMISSED*** **without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* ***DISMISSED*** **without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

**Footnotes**

1    This is the fourth civil rights action filed by Plaintiff in this District. Generally, two of these actions arose out of Plaintiff's refusal to consent to a strip search and the subsequent actions taken against Plaintiff as a result of his refusal. *See Groves v. New York,* 09–CV–0406, Decision and Order (N.D.N.Y. filed May 11, 2009) (Hurd, J.) (*sua sponte* dismissing complaint pursuant to 28 U.S.C. § 1915[e][2][B] ); *Groves v. The State of New York,* 9:09–CV–0412, Decision and Order (N.D.N.Y.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

filed Mar. 26, 2010) (Sharpe, J.) (granting defendants' motion to dismiss the complaint pursuant to *Fed.R.Civ.P. 12*[b][6] ). The third action alleged numerous violations of Plaintiff's constitutional rights during the period July 23, 2009, and August 26, 2009, and was dismissed without prejudice upon Plaintiff's request in October, 2010. *See Groves v. Maxymillian,* 9:09–CV–1002, Decision and Order (N.D.N.Y. filed Oct. 8, 2010) (Suddaby, J.). As a result, it does not appear that the current action is barred because of res judicata, collateral estoppel, and/or the rule against duplicative litigation.

2   At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

3   The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." *28 U.S.C. § 1915A(b).*

4   *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

5   *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

6   It should be emphasized that *Fed.R.Civ.P. 8*'s plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under *Fed.R.Civ.P. 8(a)* (2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson*)

7   *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

8   Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

9   Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if that treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

10   The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. *Fed.R.Civ.P. 15(a).* However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The

2012 WL 651919

Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

11   *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

12   *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

13   *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

14   For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

15   Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

---

**End of Document**                               © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:19-cv-00577-GTS-TWD    Document 9    Filed 06/21/19    Page 30 of 63

2000 WL 1335865
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Martin JOHNSON, Plaintiff,

v.

THE CITY OF NEW YORK, Assistant
District Attorney Robert Henoch, Captain
of Corrections Martin, Corrections Officer
Schmidt, Corrections Officer Brown and
Unidentified Correction Officers, Defendants.

No. 00CIV.3626(SHS).
|
Sept. 15, 2000.

OPINION AND ORDER

STEIN, D.J.

*1 Martin Johnson has brought this action pursuant to 42 U.S.C. § 1983 seeking monetary damages on the grounds that the defendants—the City of New York, an Assistant District Attorney, and certain Corrections Officers—violated his constitutional rights under the Fourth, Eighth and Fourteenth Amendments to the U.S. Constitution by failing to protect him from an attack by fellow inmates against whom he had arranged to testify. Johnson also asserts two tort claims. The Assistant District Attorney moves to dismiss the complaint as it pertains to him pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted and pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. For the following reasons, the motion is granted and the complaint is dismissed as to ADA Henoch.

BACKGROUND

The facts are taken from plaintiff's complaint and are assumed to be true for purpose of this motion. In May of 1998 Johnson was arrested for allegedly selling crack cocaine. Complaint at 4. Shortly after his arrest, he entered into a cooperation agreement with ADA Henoch to testify against several of his co-defendants. [1] Id. ADA Henoch allegedly "assured" plaintiff at that time that he

"would protect him[ ]" from possible retaliation by his co-defendants. Id. Johnson claims that he was being held in Beacon, a housing area on Rikers Island, which was in "the same general area" as where the people against whom he was to testify were held and that he alerted ADA Henoch of this fact. Id. ADA Henoch "explicitly assured [him] that he would be safe" and that "he would be placed in protective custody." Id. at 4–5. Plaintiff also alerted defendant Corrections Officers Martin, Schmidt, Brown and "Unidentified Correction Officers" to his danger. Id. at 5.

On February 24, 1999, plaintiff was attacked by fellow inmates "who called him a snitch as they beat and kicked him." Id. As a result of the beating, Johnson suffered a fractured ankle, injuries to his head, neck and legs, and damage to his retina that required surgery. Id. ADA Henoch, after learning of the attack on plaintiff, "acknowledged [his] prior request for protection." Id.

As noted above, Johnson has filed this action against the City of New York, Correction Officers Martin, Schmidt, Brown, and ADA Henoch and the ADA has moved to dismiss the complaint on the grounds that it fails to state a constitutional claim for which relief may be granted and that he is entitled to either absolute or qualified prosecutorial immunity.

DISCUSSION

When reviewing a motion to dismiss, a court must accept as true the factual allegations of the complaint and must view the pleadings in the light most favorable to and draw all reasonable inferences in favor of the non-moving party. See Jamison v. Dee, 2000 WL 502871 (S.D.N.Y. April 27, 2000) (citing Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir.1993)). Dismissal of the complaint is only proper when "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46 (1957).

I. Absolute Immunity

*2 It is well-established that prosecutors are absolutely immune from suits for damages arising from actions which are "intimately associated with the judicial phase of the criminal process." Imbler v. Pachtman, 424 U.S. 409,

2000 WL 1335865

430–31, 96 S.Ct. 984, 994–95, 47 L.Ed.2d 128 (1976); see *Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). Whether a prosecutor has absolute immunity "depends principally on the nature of the function performed, not on the office itself." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 530 (2d Cir.1993). Such functions include the decision to bring charges against a defendant, *see Gan,* 996 F.2d at 530, presenting evidence to a grand jury, *see Barret v. United States,* 789 F.2d 565, 571–72 (2d Cir.1986), and the evaluation of evidence prior to trial. *See Kalina v. Fletcher,* 522 U.S. 118, 126, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997). Absolute immunity is not available, however, when a prosecutor "undertakes conduct that is beyond the scope of his litigation-related duties." *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987).

*Barbera v. Smith,* 836 F.2d 96, 100, is closely analogous to this action. In *Barbera,* the Second Circuit held that a prosecutor was not entitled to absolute immunity where he twice refused to provide a cooperating witness with police protection. *Id.* at 98. The witness had agreed to testify in return for a more lenient sentence and was murdered by a contract killer hired by the target of the prosecutor's investigation. *Id.* The Court found that "the government was still seeking evidence, including testimony from [the victim], that would enable it to prosecute ..." and that "this task [providing protection] was [not] so intimately associated with the judicial phase of the criminal process ..." as to entitle the prosecutor to absolute immunity. *Id.*

Here, as in *Barbera,* defendant's activities were not "so intimately associated with the judicial phase of the criminal process" as to entitle him to absolute immunity from suit. *See Gan,* 996 F.2d at 531 ("the claim that [the prosecutor] failed to protect [plaintiff] asserts conduct that plainly is not integral either to a decision of whether or not to institute a prosecution or to the conduct of judicial proceedings. Accordingly, if [defendant] is to be accorded immunity ... it can only be qualified immunity ."). Therefore absolute immunity is not available to the district attorney in this action.

II. *Qualified Immunity*
In general, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983). Qualified

immunity is an affirmative defense that must be pleaded by the official claiming it. *See Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 72 L.Ed .2d 396 (1982)). Dismissal for failure to state a claim is thus appropriate where the complaint itself presents the qualified immunity defense. *See, e.g., Green,* 722 F.2d at 1019. The United States Supreme Court has also held that "unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *See also Robison v. Via,* 821 F.2d 913, 920 (2d Cir.1987) (citing *Procunier v. Navarette,* 434 U.S. 555, 565 (1978) (prison officials entitled to dismissal of claims of violating prisoner's First and Fourteenth Amendment rights by interfering with mail where such rights had not been clearly established)). Even when viewed in the light most favorable to plaintiff and drawing all reasonable inferences in his favor, *Mills,* 12 F.3d at 1174, Johnson's allegations regarding the District Attorney do not state a violation of a clearly established constitutional right. Thus, dismissal pursuant to Fed.R.Civ.P. 12(b)(6) is appropriate. *See, e.g., Molinelli v. Tucker,* 901 F.2d 13, 16 (2d Cir.1990).

**\*3** Qualified immunity shields government actors performing discretionary functions from " 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ' *Lennon v. Miller,* 66 F.3d 416, 420 (2nd Cir.1995) (quoting *Harlow,* 457 U.S. at 818). To determine whether a right was clearly established at the time defendant acted, the Court must consider: "(1) whether the right in question was defined 'with reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Gan,* 996 F.2d at 532 (quoting *Jermosen v.. Smith,* 945 F.2d 547, 550 (2d Cir.1992)).

The District Attorney claims that he is entitled to qualified immunity because, even if he had a constitutional duty to protect Johnson, it was not a clearly established duty. The Due Process Clause itself does not require the State to protect "the life, liberty, [or] property of its citizens against invasion by private actors." *Deshaney v. Winnebago*

*County Dep't of Soc. Servs.,* 489 U.S. 189, 195, 109 S.Ct. 998, 1002, 103 L.Ed.2d 249 (1989). Therefore, as a general rule, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. at 1004. The only judicially recognized exceptions to this rule are custodial relationships where "the State takes a person into its custody and holds him there against his will," *Id.* at 199–200, 109 S.Ct. at 1005 (the "special relationship" exception), or when the government affirmatively creates or increases the danger an individual is placed in. *See Dwares v. City of N.Y.,* 985 F.2d 94, 98–99 (2d Cir.1993) (the "state-created danger" exception).

Special relationships that have given rise to a governmental duty to protect against third-person attacks include "custodial relationships such as a prison and inmate or a mental institution and involuntarily committed patient, and the relationship between a social service agency and foster child." *Gan,* 996 F.2d at 532 (citing cases).

The Second Circuit has also recognized the state-created danger exception to *DeShaney's* general rule. *See Dwares,* 985 F.2d at 99 (police officers agreed in advance with members of a group to allow the group to assault the plaintiff, did not interfere during the beating and did not arrest those who assaulted the plaintiff); *Hemphill v. Schott,* 141 F.3d 412, 418 (2d Cir.1998) (arresting officers returned gun to robbery victim and drove him to the scene of suspect's arrest, where the victim shot the suspect); *see also Freeman v. Ferguson,* 911 F.2d 52, 54 (8th Cir.1990) (reversing dismissal on qualified immunity grounds against police chief who instructed subordinates to ignore victim's request for protection from her husband, who was the chief's friend).

**\*4** Johnson contends that the District Attorney's proffer of the cooperation agreement and assurance that he would protect plaintiff conferred upon the District Attorney a constitutional duty to protect Johnson. [2] Plaintiff claims that the prosecutor's duty to protect him was clearly established by *DeShaney* and by *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (prison officials may be held liable under Eighth Amendment for denying humane conditions of confinement only if they know that inmates face substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it). However, neither *DeShaney* nor

*Farmer* clearly establish the law regarding plaintiff's allegations. While the very action in question need not have been previously held unlawful for a constitutional right to be clearly established, *Duncan v. Kean,* 1995 WL 649931, *3 (S.D.N.Y. Nov. 6, 1995) (citing *Aveni v. Mottola,* 35 F.3d 680, 686 (2d Cir.1994)), it must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 639 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

The Second Circuit has twice considered and rejected claims against prosecutors for failure to protect a witness from attack by a third party. *See Barbera,* 836 F.2d at 100–01; *Gan,* 996 F.2d at 533–34. In *Gan,* a panel of the Second Circuit wrote that

> "[p]laintiffs have not called to our attention any case before or since [*Barbera* ] ... in which the lodging of a complaint with law enforcement officials, or the complainant's compliance with a request to identify suspects, either singly or in combination, has been held (a) to create a relationship that gives the complaining witness a constitutional right to protection, or (b) to impose a corresponding duty on a prosecutor."

*Id.* at 533–34.

Here, as in *Gan,* plaintiff points to no case, and the Court is aware of none, where it has been held that a prosecutor's alleged promise to protect an inmate who agrees to testify creates a special relationship that gives rise to a constitutional right to protection from a third party. Nor is the Court aware of any decision which has held that the mere proffer of a cooperation agreement by a prosecutor so increases the danger to an inmate that it creates a constitutional duty for the prosecutor to protect the inmate from potential attacks by third persons. A *prison official's* willful failure to protect an inmate from another inmate's violent actions violates the Constitution if the officer was "deliberate[ly] indifferen[t] to the consequences of his conduct for those under his

Case 1:19-cv-00577-GTS-TWD    Document 9    Filed 06/21/19    Page 33 of 63

control and dependent upon him," *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988). However, no corresponding duty has been found to exist between an inmate and prosecutor.

Based on the limited caselaw in existence at the time of the alleged attack, and particularly because of the absence of any caselaw which holds that any state actor other than a prison official owes a duty to protect an inmate from another inmate's violent actions, it cannot be said that it was clearly established that defendant ADA Henoch had created or assumed a special relationship with Johnson imbuing him with a constitutional duty to protect him. Therefore, this Court "need not decide whether [it] would hold that these circumstances create such a right and corresponding duty, for in the absence of any such holdings and in the face of the general rule articulated in *DeShaney,* it could not have been clear to a reasonable prosecutor that his failure to provide protection ... would have violated [plaintiff's] rights under the Constitution." *Gan,* 996 F.2d at 534. Defendant Henoch is therefore entitled to qualified immunity.

### III. *The Pendent State Claims*

**\*5** The ADA's motion to dismiss plaintiff's pendent state law claims is likewise granted. The Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). Accordingly, the state law claims against ADA Henoch are dismissed without prejudice. *See United Mine Workers of America v. Gibbs,* 338 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350 n. 7, 98 L.Ed.2d 720 (1988); *Mayer v. Oil Field Systems Corp.,* 803 F.2d 749, 757 (2d Cir.1986).

### IV. *CONCLUSION*

For the reasons set forth above, the prosecutor's motion to dismiss is granted and the complaint is dismissed as against the assistant district attorney.

SO ORDERED:

### All Citations

Not Reported in F.Supp.2d, 2000 WL 1335865

---

Footnotes

1    The complaint states that plaintiff entered into the cooperation agreement with ADA Henoch on June 18, 1999. Complaint at 4. Plaintiff's opposition, however, states the cooperation agreement was entered into in "June of 1998". Opposition at 2. In addition, plaintiff has recently sought—successfully—to amend the complaint to allege that the agreement was made in June of 1998. Accordingly, this Court will assume that plaintiff entered into the cooperation agreement with defendant in June, 1998.

2    Johnson does not specify whether he is claiming defendant Henoch owed a duty to protect him based on the special relationship or state-created danger exception to the *DeShaney* rule. For the purpose of this motion, both arguments will be addressed.

---

**End of Document**                                                     © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 117602
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

David T. SILVA, Gerrod T. Smith, and
Jonathan K. Smith, Members of the
Shinnecock Indian Nation, Plaintiffs,
v.
Brian FARRISH, Jamie Greenwood, Evan
Laczi, Basil Seggos, New York State Department
of Environmental Conservation, and Suffolk
County District Attorney's Office, Defendants.

18-CV-3648 (SJF)(SIL)
|
Signed 01/07/2019

**Attorneys and Law Firms**

Scott M. Moore, Moore International Law Office PLLC,
New York, NY, for Plaintiffs.

Richard H. Yorke, Toni E. Logue, New York State
Attorney General's Office, Mineola, NY, Brian C.
Mitchell, Suffolk County Dept. of Law-County Attorney,
Hauppauge, NY, for Defendants.

**REPORT AND RECOMMENDATION**

STEVEN I. LOCKE, United States Magistrate Judge

**\*1** By way of Complaint dated June 22, 2018, Plaintiffs
David T. Silva ("Silva"), Gerrod T. Smith ("Gerrod")
and Jonathan K. Smith ("Jonathan") (Silva, Gerrod
and Jonathan collectively, "Plaintiffs"), Members of the
Shinnecock Indian Nation (the "Tribe"), commenced this
action alleging violations of their aboriginal usufructuary
fishing rights under the Supremacy Clause of the United
States Constitution, U.S. Const. art. VI, cl. 2, and a
continuing pattern of race discrimination in violation of
Sections 1981 and 1982 of the Civil Rights Act of 1866, as
amended, 42 U.S.C. §§ 1981, 1982, by Defendants Brian
Farrish ("Farrish"), Jamie Greenwood ("Greenwood"),
Evan Laczi ("Laczi"), Basil Seggos ("Seggos"), the New
York State Department of Environmental Conservation
("NYDEC") and the Suffolk County District Attorney's
Office ("SCDA") (Greenwood and SCDA together,
the "County Defendants") (Farrish, Laczi, Seggos and

the NYDEC collectively, the "State Defendants") (the
County Defendants and the State Defendants collectively,
"Defendants"). *See* Complaint ("Compl."), Docket Entry
("DE") [1]. [1] Presently before the Court, on referral
from the Honorable Sandra J. Feuerstein for Report
and Recommendation, are: (i) the County Defendants'
motion to dismiss the Complaint pursuant to Rule 12(b)
(6) of the Federal Rules of Civil Procedure ("Fed. R.
Civ. P."), DE [54]; (ii) the State Defendants' motion to
dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)
(1) and 12(b)(6), DE [56]; and (iii) Plaintiffs' motion for
leave to file a sur-reply to Defendants' respective motions,
DE [59]. For the reasons set forth herein, the Court
respectfully recommends that the supplemental materials
submitted by Plaintiffs be considered as a sur-reply,
but that Defendants' motions to dismiss nevertheless be
granted and the Complaint be dismissed in its entirety.
However, the Court further recommends that Plaintiffs
be granted leave to replead, but only as to their statutory
claims for monetary damages against Farrish, Laczi and
Seggos in their individual capacities.

**I. BACKGROUND**

**A. Relevant Facts** [2]
Plaintiffs are members of the Shinnecock Indian Nation,
a federally-recognized Indian tribe, [3] who reside on
the Shinnecock Indian Reservation (the "Reservation")
located in Suffolk County, New York. *See* Compl. ¶¶
2-4. At all relevant times, Plaintiffs have fished in the
waters of Shinnecock Bay and its estuary. *See id.* ¶ 14.
According to Plaintiffs, the following "Colonial Deeds
and related documents" support their aboriginal right to
fish in such waters without interference: (i) "Department
of State Book of Deeds, Unpublished documents, Office
of the Secretary of State, Albany, New York, 2:85-86.
(New York State Archives. Series 452, vols. 1-9)"; (ii)
"Gardiner, David Lion, 1873 [1840] *Chronicles of East
Hampton*, Sag Harbor, N.Y.: Isabel Gardiner Mairs, 3";
(iii) "*Documents Relative to the Colonial History of the
State of New York*, ed. Edmund Bailey O'Callaghan and
Berthold Fernow, 15 vols. Albany, N.Y.: Weed Parsons,
1856-87, 14:686, 692, 695, 718, 720"; (iv) "*Records of the
Town of East Hampton*, ed. Joseph Osborne, 5 vols. Sag
Harbor, N.Y. 1887, 1:2-3, 1:170-171"; (v) "*Records of
the Town of Southampton*, ed. William Pelletreau. 8 vols.
Sag Harbor, N.Y. 1874-77, 1:162, 167-68; 2:354-55." *See
id.* ¶ 15. Nevertheless, Plaintiffs have been ticketed and

prosecuted for alleged violations of New York State (the "State") criminal laws pertaining to fishing and raising shellfish as a consequence of exercising their fishing rights. *See id.* ¶ 16. Specifically, in or about October 2008, the State commenced a criminal action against Gerrod in the Southampton Town Justice Court (the "Justice Court") based upon his alleged possession of undersized flounder, blackfish and porgy in the Shinnecock Bay in violation of State fishing and environmental conservation laws. *See id.* ¶ 18; *New York v. Smith*, No. 08-cv-4422, 2009 WL 2390809, at *1 (E.D.N.Y. July 31, 2009). Following its removal to the United States District Court for the Eastern District of New York, that case was remanded to the Justice Court and thereafter dismissed. *See* Compl. ¶ 18; *Smith*, 2009 WL 2390809, at *3. Around the same time, the State prosecuted Salvatore Ruggiero ("Ruggiero"), a non-Indian who was fishing with Gerrod, for possession of undersized flounder, undersized blackfish and undersized porgy in violation of New York law. *See* Compl. ¶ 17. That suit was dismissed for failure to establish jurisdiction. *See id.* The State subsequently brought charges against Jonathan, also in the Justice Court, for possessing a shellfish farm in the Shinnecock Bay without a license. *See* Compl. ¶ 19. That case was likewise removed to the Eastern District of New York and thereafter dismissed on June 15, 2010 for failure to prosecute pursuant to Fed. R. Civ. P. 41(b). *See id.*; *New York v. Smith*, No. 09-cv-571 (E.D.N.Y.), DEs [1], [5].

**\*2**  Most recently, on April 20, 2017, while Silva was fishing for elver eels [4] in the Shinnecock Bay, Laczi and Farrish—both Conservation Officers with the NYDEC—issued Silva a criminal appearance ticket alleging unlawful possession of undersized eels in violation of the Official Compilation of Codes, Rules & Regulations of the State of New York ("NYCRR"), title 6, Section 40-1(b)(ii). [5] *See* Compl. ¶¶ 5, 7, 20. Silva's catch, net and other fishing equipment were seized at that time. *See id.* ¶ 20. The State, through Suffolk County Assistant District Attorney Greenwood, then commenced a criminal action against Silva in the Justice Court, charging him with fishing without a license in violation of New York Environmental Conservation Law ("NYECL") Section 13-0355, as well as unlawful possession of underage eels and eels over limit in violation of NYCRR, title 6, Sections 40-1(b)(ii)-(iii). *See id.* ¶¶ 6, 20. Silva's efforts to obtain a dismissal of that action were unsuccessful. *See id.* ¶ 20. As of the date Plaintiffs filed their Complaint in the instant case, a trial

in Silva's criminal case was scheduled to begin on August 30, 2018 in the Justice Court. *See id.* [6]

Plaintiffs allege that Defendants continue to ticket them and threaten prosecution. *See id.* ¶ 16. As a result, Plaintiffs "are in fear of exercising those same usual and customary aboriginal fishing rights secured and retained for them by their ancestors when Shinnecock territory was ceded to the English." *Id.* [7]

### B. Procedural History

On June 22, 2018, Plaintiffs filed their Complaint requesting preliminary and permanent injunctive relief, a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, as well as Fed. R. Civ. P. 65, and monetary damages against Defendants. *See generally* Compl. In Count I of the Complaint, Plaintiffs assert that "Defendants' repeated interference, seizures and prosecution of the Plaintiffs by application of New York State fishing regulations violates Plaintiffs' fishing rights protected under the Supremacy Clause, was and is void, and was and is in excess of New York State jurisdiction." *Id.* ¶ 23. Plaintiffs further allege in Count II that Defendants' conduct amounts to "a continuing pattern and practice of purposeful acts of discrimination based on [Plaintiffs'] race as Native Americans in violation of [their] civil rights to equal security of the laws ..." and to exercise their federally-protected fishing and other related rights without interference by Defendants. *Id.* ¶ 25. In their Prayer for Relief, Plaintiffs request, as to Count I:

> [A] declaratory judgment, and preliminary and permanent injunctive relief ... enjoining the Defendants from enforcing the laws of the State of New York against ... Silva in the ... Justice Court in Case No. 17-7008, and from otherwise interfering with Plaintiffs' use of the waters, fishing, taking fish, and holding fish in Shinnecock Bay and its estuary and other usual and customary Shinnecock fishing waters.

**\*3** *Id.* at WHEREFORE ¶ 1. With respect to Count II, Plaintiffs seek "$102 million [in] punitive damages to deter and punish the Defendants for blocking Plaintiffs' participation in the elver eel market during the 2017 and 2018 seasons, plus any future seasons during the pendency of this action, plus attorney fees and costs." *Id.* at WHEREFORE ¶ 2.

Together with their Complaint, and based upon the conduct alleged therein, Plaintiffs filed a motion for a preliminary injunction. *See* DE [2]. In support of their application, Plaintiffs submitted, among other materials, a report prepared by Dr. John A. Stong, Professor Emeritus at Long Island University, which addressed the "Shinnecock rights to the bounty of their maritime ecosystem." DE [3-10]. Both the County Defendants and the State Defendants opposed Plaintiffs' motion. *See* DEs [44], [46], [47]. The State Defendants' arguments in opposition to Plaintiff's application for preliminary injunctive relief relied in part upon the Gilmore Declaration. *See* DE [47]. At a motion hearing held on July 27, 2018, Judge Feuerstein informed the parties that the motion for a preliminary injunction would be denied, set a briefing schedule on the County Defendants' and the State Defendants' anticipated motions to dismiss, and referred such anticipated motions to this Court for Report and Recommendation. *See* DE [49]. Several days after that hearing, on July 31, 2018, Judge Feuerstein issued a Memorandum and Order denying Plaintiffs' motion for a preliminary injunction on several grounds. *See* DE [48]. Initially, Judge Feuerstein found that Silva did not clearly show a likelihood of success on the merits of the Complaint due to factual questions concerning whether he was fishing outside the waters of the Shinnecock Reservation and whether he would need a New York State fishing license to fish in non-tribal waters. *See id.* at 8. Further, Judge Feuerstein concluded that the *Younger* abstention doctrine barred the relief sought by Silva because there was a pending state criminal action against him that implicated the State's interest in enforcing its generally applicable fishing regulations, and which provided an adequate opportunity for judicial review of his federal constitutional claim. *See id.* at 9. No exceptions to *Younger* applied, Judge Feuerstein ruled, as Plaintiffs failed to either submit adequate evidence of bad faith or demonstrate any extraordinary circumstance warranting intervention. *See id.* at 9-10. Lastly, Judge Feuerstein determined that Gerrod and Jonathan lacked standing to obtain the injunctive relief they sought because each of

their prior prosecutions occurred nearly ten years ago, and neither individual was, at the time, facing any related criminal charges. *See id.* at 10-11.

The County Defendants and the State Defendants filed their fully briefed motions to dismiss on August 13, 2018 and August 23, 2018, respectively. *See* DEs [54], [56]. Shortly thereafter, Judge Feuerstein entered an Order referring both motions to this Court for Report and Recommendation. *See* Electronic Order dated August 24, 2018.

On October 8, 2018, Plaintiffs submitted a letter informing the Court that, while preparing for Silva's criminal proceeding in the Justice Court, they discovered evidence demonstrating that statements in the Gilmore Declaration were false and thus supporting their allegations of discriminatory conduct and bad faith. *See* DE [57]. According to Plaintiffs, various NYDEC and U.S. Fish & Wildlife Services publications contradict Gilmore's contention that "American eel (Anguilla rostrate) are an important and *protected resource* [whose] ... population is *depleted* and at *historically low levels* for several reasons, including *overfishing*." *Id.* at 2 (emphasis in original) (quoting Gilmore Declaration ¶ 4). Consequently, Plaintiffs requested leave to file the publications at issue as "supplement[s]" in connection with the pending motions to dismiss. *See* DE [57] at 2. The State Defendants opposed Plaintiffs' application, by letter dated October 9, 2018, on the basis that the proposed supplemental filings have no relevance to any of the issues currently before the Court. *See* DE [58]. On October 12, 2018, Judge Feuerstein denied the motion without prejudice and directed Plaintiffs in any renewed application to, at a minimum: (i) "specifically identify what they are seeking to supplement"; (ii) "provide specific citations to the proposed supplemental materials (including publication dates)"; and (iii) "articulat[e] the basis or bases for permitting such supplementation." Electronic Order dated October 12, 2018.

**\*4** Plaintiffs filed a renewed letter motion on October 15, 2018, addressing the initial deficiencies identified by Judge Feuerstein. *See* DE [59]. At the outset, Plaintiffs clarified that they are seeking leave to file the letter, along with the exhibits attached thereto, collectively as a sur-reply to the pending motions to dismiss. *See id.* at 1. Moreover, Plaintiffs reiterated and expanded their argument that the materials undermine several assertions in the Gilmore

Declaration. *See id.* at 2. On October 22, 2018, Plaintiffs filed yet another letter supplementing their renewed motion. *See* DE [60]. In that submission, Plaintiffs requested leave to submit two additional documents—internal NYDEC emails involving James Gilmore, which Plaintiffs obtained from Greenwood in connection with Silva's criminal case—as part of their sur-reply. *See id.* at 1-2. The State Defendants filed opposition to Plaintiffs' renewed request on October 22, 2018. *See* DE [61]. Judge Feuerstein then referred Plaintiffs' application to this Court. *See* Electronic Order dated October 26, 2018.

## II. LEGAL STANDARDS

### A. Fed. R. Civ. P. 12(b)(1)

"Pursuant to Article III, § 2 of the United States Constitution, the jurisdiction of the federal courts is limited to 'Cases' and 'Controversies,' which restricts the authority of the federal courts to resolving 'the legal rights of litigants in actual controversies.' " *Amityville Mobile Home Civic Ass'n v. Town of Babylon*, No. 14-cv-2369, 2015 WL 1412655, at *2 (E.D.N.Y. Mar. 26, 2015) (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71, 133 S.Ct. 1523, 1528, 185 L.Ed.2d 636 (2013) ). In the absence of a case or controversy, Fed. R. Civ. P. 12(b)(1) "provides that a party may move to dismiss a case for lack of subject matter jurisdiction." *Amityville Mobile Home*, 2015 WL 1412655, at *3; *see also Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."). The Second Circuit has held that "[t]he hallmark of a case or controversy is the presence of adverse interests between parties who have a substantial personal stake in the outcome of the litigation." *Evans v. Lynn*, 537 F.2d 571, 591 (2d Cir. 1975); *see also Ayazi v. N.Y.C. Bd. of Educ.*, No. 98-cv-7461, 2006 WL 1995134, at *2 (E.D.N.Y. July 14, 2006) ("Without standing, this court does not have jurisdiction to hear the claim."), *vacated on other grounds*, 315 Fed.Appx. 313 (2d Cir. 2009). To survive a defendant's motion to dismiss for lack of subject matter jurisdiction, "a plaintiff must allege facts 'that affirmatively and plausibly suggest that it has standing to sue.' " *Brady v. Basic Research, L.L.C.*, 101 F.Supp.3d 217, 227 (E.D.N.Y. 2015) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) ).

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(1), "a court must accept as true all material factual allegations in the complaint and refrain from drawing inferences in favor of the party contesting jurisdiction." *U.S. ex rel. Phipps v. Comprehensive Cmty. Dev. Corp.*, 152 F.Supp.2d 443, 449 (S.D.N.Y. 2001). However, "[w]here subject matter jurisdiction is challenged, ... a court may consider materials outside the pleadings, such as affidavits, documents and testimony." *Id.*; *see also Forbes v. State Univ. of New York at Stony Brook*, 259 F.Supp.2d 227, 231-32 (E.D.N.Y. 2003) ("In a Rule 12(b)(1) motion, the Court may consider affidavits and other material beyond the pleadings to resolve the jurisdictional question." (citation omitted) ). The party advocating jurisdiction bears the burden of establishing its existence by a preponderance of the evidence. *See In re Jesup & Lamont, Inc.*, No. 12-1169, 2012 WL 3822135, at *2 (S.D.N.Y. Sept. 4, 2012).

### B. Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1940, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1960, 167 L.Ed.2d 929 (2007) ). A claim is considered plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. at 1949. But, a pleading "that offers only 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965). "Nor does a complaint suffice if it tenders 'naked assertion[s] devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. at 1966).

**\*5** In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a court must 'accept all allegations in the complaint as true and draw all inferences in the nonmoving party's favor.' " *U.S. ex rel. Siegel v. Roche Diagnostics Corp.*, 988 F.Supp.2d 341, 343 (E.D.N.Y. 2013) (quoting *LaFaro v. N.Y. Cardiothoracic Grp.*, 570 F.3d 471, 475 (2d Cir. 2009) ). Nevertheless, "threadbare recitals of the elements of a cause of action" that are supported by "conclusory" statements and mere speculation are inadequate and subject to dismissal.

*Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation and citation omitted); *see Iqbal*, 556 U.S. at 678, 129 S.Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). "The court's consideration on a motion under Fed. R. Civ. P. 12(b)(6) is limited to the factual allegations in the complaint; documents incorporated by reference into the complaint; matters of which judicial notice may be taken; and documents either in plaintiff's possession or of which plaintiff had knowledge and relied on in bringing suit." *Messina v. Mazzeo*, 854 F.Supp. 116, 128 (E.D.N.Y. 1994) (citing *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) ).

## III. DISCUSSION

### A. Plaintiffs' Supplemental Submissions

As a threshold matter, the Court must determine whether, in evaluating the instant motions to dismiss, it should consider the "supplemental" materials electronically submitted by Plaintiffs nearly two months after Defendants filed their fully-briefed motions to dismiss. The submissions at issue are: (i) the supplemental letters themselves, DEs [59], [60]; (ii) a document published on the NYDEC website entitled "List of Endangered, Threatened and Special Concern Fish & Wildlife Species of New York State[,]" *see* DE [59], Exhibit ("Ex.") B; (iii) a research document about the American Eel published on the NYDEC website, *see id.*, Ex. C; (iv) a U.S. Fish & Wildlife Service press release entitled "American Eel Population Remains Stable, Does not Need ESA Protection[,]" *see id.*, Ex. D; (v) a U.S. Fish & Wildlife Service publication on the American Eel, *see id.*, Ex. E; and (vi) two internal NYDEC emails involving Gilmore, *see* DE [60], Exs. F, G. Plaintiffs argue that the publications prove statements in the Gilmore Declaration to be false and, as a result, support their allegations of discriminatory conduct and bad faith. *See* DE [59]. Most significantly, Plaintiffs assert that the publications demonstrate that Gilmore overstated the urgency of American Eel conservation efforts. *See id.* In addition, Plaintiffs contend that the emails in question show that "the Shinnecock were referred to and targeted for prosecution by race" and that they belie Gilmore's claim that the American Eel is "endangered, threatened, or ... of special concern under New York law." *See* DE [60].

In evaluating Plaintiffs' application, the initial question is whether the Court should consider the supplemental submissions in any respect. "Motions for leave to file sur-reply information ... are subject to the sound discretion of the court." *Barbour v. Colvin*, 993 F.Supp.2d 284, 287 (E.D.N.Y. 2014) (citation omitted). The Individual Rules of Judge Feuerstein provide that "all motion briefs, including reply briefs are to comply with the Court's Local Rules ... [,] and *[n]o rebuttal, sur-reply, etc., shall be accepted.*" (underline in original changed to italics). Nevertheless, based on Plaintiffs' representation that the subject documents were newly-discovered, the Court recommends that Plaintiffs' application to submit the materials at issue collectively as a sur-reply be granted. Plaintiffs' supplemental submissions touch upon questions involving the bad faith exception to the *Younger* abstention doctrine and discriminatory intent as it relates to Plaintiffs' claims under 42 U.S.C. §§ 1981 and 1982. As such, the Court deems them useful in evaluating the instant motions. Thus, in light of the legal standards summarized above, the Court considers all of the supplemental materials in connection with the State Defendants' Fed. R. Civ. P. 12(b)(1) motion, and only the legal assertions within the letters themselves in connection with Defendants' Fed. R. Civ. P. 12(b)(6) motions.

**\*6** The Court does not, however, recommend converting Defendants' Fed. R. Civ. P. 12(b)(6) motions into motions for summary judgment under Fed. R. Civ. P. 56. On a 12(b)(6) motion, "[i]f matters outside the pleadings are presented to the court, a court may convert the motion to dismiss into a summary judgment motion." *Vaillete v. Lindsay*, No. 11-cv-3610, 2014 WL 4101513, at *3 (E.D.N.Y. Aug. 18, 2014) (citing Fed. R. Civ. P. 12(d) ); *see also Friedl v. City of N.Y.*, 210 F.3d 79, 83 (2d Cir. 2000) ("When matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." (citation, internal quotation marks and alterations omitted) ). Whether to convert the motion is in the district court's discretion. *See Liberty Mut. Ins. Co. v. N. Picco & Sons Contracting Co.*, No. 05-cv-217, 2008 WL 190310, at *3 (S.D.N.Y. Jan. 16, 2008). Here, the Court recommends that Judge Feuerstein decline to convert Defendants' motions to dismiss into motions for summary judgment, as the

documents in question were not submitted with the parties' initial briefing, and neither party has raised the prospect of conversion. Accordingly, the Court will consider Plaintiffs' supplemental submissions collectively as a sur-reply and in accordance with the standards governing Defendants' motions to dismiss.

### B. Defendants' Motions to Dismiss

Having resolved this initial procedural issue, the Court turns to the respective motions to dismiss. Applying the standards outlined above, and for the reasons set forth below, the Court respectfully recommends that Defendants' motions be granted and that the Complaint be dismissed.

### 1. The State Defendants

The State Defendants move to dismiss Plaintiffs' Complaint on the grounds that: (i) all claims against the NYDEC, as well as those against Farrish, Laczi and Seggos in their official capacities, are barred by the Eleventh Amendment and principles of sovereign immunity, *see* State Defendants' Memorandum of Law in Support of Motion to Dismiss Complaint ("State Defs.' Mem."), DE [56-3], at 3-6; (ii) the claims for injunctive and declaratory relief as to Silva are precluded under the *Younger* abstention doctrine, *see id.* at 6-7; (iii) Gerrod and Jonathan lack standing to assert their claims for injunctive and declaratory relief, *see id.* at 7-9; (iv) the Complaint fails to state a claim under Fed. R. Civ. P. 12(b)(6), *see id.* at 9-23; and (v) Farrish, Laczi and Seggos are entitled to qualified immunity with respect to the claims against them in their individual capacities, *see id.* at 23-24. Because, as explained herein, the Court recommends dismissal of Plaintiffs' claims for declaratory and injunctive relief as against the State Defendants on multiple jurisdictional bases and dismissal of Plaintiffs' claims for monetary damages against the NYDEC, as well as Farrish, Laczi and Seggos in their official capacities, on Eleventh Amendment grounds, the Court addresses the underlying merits of only Plaintiffs' claims for monetary damages and not their claims for declaratory and injunctive relief. *See Amityville Mobile Home*, 2015 WL 1412655, at *3 ("When presented with motions under both Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), the Court must first analyze the 12(b)(1) motion to determine whether the court has the subject-

matter jurisdiction necessary to consider the merits of the action."). Moreover, as Plaintiffs fail to state a claim against Farrish, Laczi and Seggos in their individual capacities under 42 U.S.C. § 1981 or § 1982, the Court does not analyze the State Defendants' qualified immunity argument.

### a. Eleventh Amendment Sovereign Immunity

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const., amend. XI. Absent consent to suit or an express statutory waiver of a state's otherwise presumed sovereign immunity, the Eleventh Amendment bars suits in federal court by private parties against the state. *Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 363, 121 S.Ct. 955, 962, 148 L.Ed.2d 866 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court."). [8] This immunity extends not only to the state itself, but also to entities considered "arms of the state." *Clissuras v. City Univ. of New York*, 359 F.3d 79, 81 (2d Cir. 2004) (quoting *McGinty v. New York*, 251 F.3d 84, 95 (2d Cir. 2001) ); *see Naples v. Stefanelli*, 972 F.Supp.2d 373, 390-91 (E.D.N.Y. 2013) (dismissing claims against the NYDEC on Eleventh Amendment immunity grounds). "Likewise, the Eleventh Amendment bars suits for monetary damages against a state official acting in his or her official capacity." *LoSardo v. Ribaudo*, No. 14-cv-6710, 2015 WL 502077, at *2 (E.D.N.Y. Feb. 5, 2015) (citation omitted). Thus, a claim that is barred by a state's sovereign immunity is properly dismissed pursuant to the Eleventh Amendment for lack of subject matter jurisdiction. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 1121, 134 L.Ed.2d 252 (1996) ("For over a century [the Supreme Court has] reaffirmed that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.' "). [9]

### i. The *Ex Parte Young* Exception

**\*7** Notwithstanding the Eleventh Amendment, "[u]nder the well-known exception [to the sovereign immunity doctrine] ... first set forth in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 [ ( 1908) ] ..., a plaintiff may sue a state official acting in his official capacity ... for prospective, injunctive relief from violations of federal law." *State Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007) (internal quotation marks and citation omitted). [10] "The *Young* exception ... rests upon the premise 'that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the [s]tate for sovereign-immunity purposes,' ... and 'is limited to that precise situation....' " *Colvin v. State Univ. Coll. at Farmingdale*, No. 13-cv-3595, 2014 WL 2863224, at \*9 (E.D.N.Y. June 19, 2014) (quoting *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254-55, 131 S.Ct. 1632, 1638, 179 L.Ed.2d 675 (2011) ); *see Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985) ("The theory of *Young* was that an unconstitutional statute is void ... and therefore does not 'impart to [the official] any immunity from responsibility to the supreme authority of the United States.' " (alteration in original) (citation omitted) (quoting *Young*, 209 U.S. at 159-60, 28 S.Ct. at 453-54) ).

The Supreme Court has, however, articulated a limited exception to the principles set forth in *Young. See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). In *Coeur d'Alene*, the Court held in a 5-4 decision that an Indian tribe and its members who sought a declaration of their entitlement to exclusive use, occupancy and right to quiet enjoyment of submerged lands claimed by the State of Idaho, could not avail themselves of *Young* and avoid the Eleventh Amendment bar to suit. *See Coeur d'Alene*, 521 U.S. at 287-88, 117 S.Ct. at 2043. In the majority opinion authored by Justice Kennedy, the Court explained:

> We do not ... question the continuing validity of the *Ex parte Young* doctrine. Of course, questions will arise as to its proper scope and application. In resolving these questions we must ensure that the doctrine of sovereign immunity remains meaningful, while also

> giving recognition to the need to prevent violations of federal law.

*Id.* at 269, 117 S. Ct. at 2034. The Court adopted the previously-recognized notion that "[w]hen suit is commenced against state officials, even if they are named and served as individuals, the [s]tate itself will have a continuing interest in the litigation whenever state policies or procedures are at stake." *Id.* (collecting cases). "The real interests served by the Eleventh Amendment[,]" Justice Kennedy instructed, "are not to be sacrificed to elementary mechanics of captions and pleading" and thus "[a]pplication of the *Young* exception must reflect a proper understanding of its role in our federal system and respect for state courts instead of a reflexive reliance on an obvious fiction." *Id.* at 270, 117 S.Ct. at 2034. The Court further explained that, although "[a]n allegation of an ongoing violation of federal law where the relief requested is prospective is ordinarily sufficient to invoke the *Young* fiction[,]" the case before it was "unusual in that the [t]ribe's suit [was] the functional equivalent of a quiet title action which implicate[d] special sovereignty interests." *Id.* at 281, 117 S.Ct. at 2040; *see also id.* at 282, 117, 117 S.Ct. 2028, 2033 S. Ct. at. 2040 ("[T]he declaratory and injunctive relief the [t]ribe seeks is close to the functional equivalent of quiet title in that substantially all benefits of ownership and control would shift from the [s]tate to the [t]ribe.... The suit seeks, in effect, a determination that the lands in question are not even within the regulatory jurisdiction of the [s]tate."). The Court proceeded to analyze the suit's impact on Idaho's "special sovereignty interests" in concluding that *Young* did not apply:

> **\*8** It is apparent ... that if the [t]ribe were to prevail, Idaho's sovereign interest in its lands and waters would be affected in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury. Under these particular and special circumstances, we find the *Young* exception inapplicable. The dignity and status of its statehood allow Idaho to rely on its Eleventh Amendment immunity and to insist upon responding to these

claims in its own courts, which are open to hear and determine the case.

*Id.* at 287-88, 117 S. Ct. at 2043. In reaching this outcome, the Court emphasized that "lands underlying navigable waters have historically been considered sovereign lands," and that "[s]tate ownership of them has been considered an essential attribute of sovereignty." *Id.* at 283, 117 S.Ct. at 2041 (internal quotation marks and citation omitted).

But Justice Kennedy did not command a majority with respect to certain reasoning justifying the Court's departure from *Young*. In a portion of his opinion joined by Chief Justice Rehnquist only, Justice Kennedy promoted a "case-by-case approach to the *Young* doctrine" requiring courts to apply a balancing test that weighs a broad range of factors—including the availability of a state forum to hear the case, the nature of the federal rights in question, and the state interests at issue—even when the complaint both alleges a continuing violation of federal law and seeks prospective relief. *Id.* at 280, 117 S.Ct. at 2028. Justice O'Connor, in a concurring opinion joined by Justices Scalia and Thomas, rejected what she described as Justice Kennedy's "vague balancing test that purports to account for a 'broad range' of unspecified factors," *id.* at 296, 117 S.Ct. at 2047 (citation omitted), as "unnecessarily recharacteriz[ing] and narrow[ing] much of [the Court's] *Young* jurisprudence[,]" *id.* at 291, 117 S.Ct. at 2045. Justice O'Connor asserted that a court applying *Young* should instead conduct only a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective...." *Id.* at 296, 117 S.Ct. at 2047. [11] Notably though, Justice O'Connor agreed that where "a plaintiff seeks to divest the [s]tate of all regulatory power over submerged lands—in effect, to invoke a federal court's jurisdiction to quiet title to sovereign lands—it simply cannot be said that the suit is not a suit against the [s]tate." *Id.* at 296, 117 S.Ct. 2028, 2033, S. Ct. at 2048.

In a subsequent case, the Supreme Court unequivocally adopted the approach to sovereign immunity articulated by Justice O'Connor in her *Coeur d'Alene* concurrence: "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law

and seeks relief properly characterized as prospective.' " *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland,* 535 U.S. 635, 645, 122 S.Ct. 1753, 1760, 152 L.Ed.2d 871 (2002) (quoting *Coeur d'Alene,* 521 U.S. at 296, 117 S.Ct. at 2047 (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment) ). In so holding, the *Verizon* Court emphasized that the inquiry concerning whether the relief sought is "properly characterized as prospective" should focus not merely on how the requested relief is captioned in the pleading, but also on its substance. *See id.* at 645-46, 122 S.Ct. at 1760. This inquiry, the Court further instructed, "does not include an analysis of the merits of the claim." *See id.* at 646, 122 S.Ct. at 1761.

**\*9** Several years after the *Verizon* decision, the Second Circuit ruled in *Western Mohegan Tribe & Nation v. Orange County* that a suit brought by an Indian tribe against the New York State Governor seeking possession of certain land within the State was barred by the Eleventh Amendment. *See* 395 F.3d 18, 23 (2d Cir. 2004). Although the court cited *Verizon* as controlling law and determined that the complaint had satisfied both components of the "straightforward" *Young* inquiry, *see id.* at 21, the Circuit nevertheless concluded, based upon *Coeur d'Alene,* that the Eleventh Amendment barred the tribe's suit:

> [T]he relief requested by the [t]ribe is, as much as that sought in *Coeur d'Alene,* the functional equivalent of quiet [*sic*] the Tribe's claim to title in the New York counties named in the complaint.... As such, the action is squarely governed by *Coeur d'Alene,* regardless of whether one undertakes the *Ex parte Young* analysis advocated by the majority opinion, or instead adopts the categorical approach enunciated in the plurality opinion.

*W. Mohegan,* 395 F.3d at 23 (citations omitted). Justifying its heavy reliance on *Coeur d'Alene,* the *Western Mohegan* court characterized the dispute before it as raising the same "core issues of land, state regulatory authority, and sovereignty...." *Id.* at 23. The court rejected the premise that, because the tribe sought "only 'Indian title,' which

[the tribe] describe[d] as the right 'to camp, to hunt, to fish, [and] to use the waters and timbers' in the contested lands and waterways[,]" its claims were more limited in nature than those in *Coeur d'Alene* and therefore not governed by the same principles. *Id.* at 22. On that issue, the court underscored the tribe's concession that Indian title nonetheless connotes the right to "exclude all others." *Id.* In conclusion, the court explained that, "[w]hile we express no opinion on the *limits* of *Coeur d'Alene's* applicability, we are bound to follow the case where, as here, it directly controls." *Id.* (emphasis in original). [12]

### ii. Application

With the principles detailed above in mind, the Court turns to their application here. As a preliminary matter, it is undisputed by Plaintiffs that the Eleventh Amendment precludes jurisdiction over their claims for monetary damages under 42 U.S.C. §§ 1981 and 1982 against the NYDEC, *see DeFranco v. Dep't of Envtl. Conservation of the State of New York*, No. 16-cv-2014, 2017 WL 1497977, at *5 (E.D.N.Y. Apr. 26, 2017) (noting that the NYDEC is a "state entity" entitled to Eleventh Amendment sovereign immunity), and against Farrish, Laczi and Seggos in their official capacities, *see LoSardo*, 2015 WL 502077, at *2. [13] Plaintiffs maintain, however, that the *Young* exception to sovereign immunity applies to their claims for injunctive and declaratory relief against Farrish, Laczi and Seggos in their official capacities. *See* Plaintiffs' Memorandum of Law in Opposition to State Defendants' Motion to Dismiss ("Pls.' Opp. to State Defs.' Mtn."), DE [56-6], at 8-11. More specifically, Plaintiffs assert that they have pled facts showing a continuing violation of the Supremacy Clause, and that they are seeking only prospective relief to protect their fishing rights. *See id.* at 8-9. Plaintiffs also seem to suggest that state regulation of Indian fishing rights is necessarily preempted by federal law. *See id.* at 9-11. The Court disagrees.

**\*10** Initially, the Court acknowledges that Plaintiffs' claims for declaratory and injunctive relief, as pled in the Complaint, facially satisfy both components of the "straightforward inquiry" under *Verizon* for determining whether *Young* should apply. Count I, entitled "Continuing Supremacy Clause Violations of Un-relinquished Aboriginal Usufructuary Fishing Rights Retained in Ceded Territory[,]" alleges that "Defendants' repeated interference, seizures, and prosecutions of the

Plaintiffs by application of New York State fishing regulations violates Plaintiffs' fishing rights protected under the Supremacy Clause...." Compl., Count I & ¶ 23. Further, the Complaint asserts that Plaintiffs "are deterred and chilled from exercising their rights to fish" in the waters adjacent to their communities. *Id.* ¶ 14. Accepting as true Plaintiffs' claims that Defendants have previously interfered with Plaintiffs' rights under the Supremacy Clause and that they continue to do so, even if only by way of threats, the Court deems the continuing violation requirement satisfied. *See KM Enterprises, Inc. v. McDonald*, No. 11-cv-5098, 2012 WL 4472010, at *10 (E.D.N.Y. Sept. 25, 2012), *aff'd*, 518 F. App'x 12 (2d Cir. 2013) ("[W]here there is a threat of [a] future [violation] ... that may be remedied by prospective relief, the ongoing and continuous requirement has been satisfied." (citation omitted) ). The Complaint likewise seeks injunctive relief that appears to be prospective in nature. *See* Compl., WHEREFORE ¶ 1 ("Plaintiffs request the Court to issue ... preliminary and permanent injunctive relief ... enjoining the Defendants from enforcing the laws of the State of New York against ... Silva in the ... Justice Court in Case No. 17-7008, and from otherwise interfering with Plaintiffs' [fishing rights].").

Nevertheless, in accordance with the *Verizon* Court's guidance, this Court must assess whether the relief sought is *properly* characterized as prospective with reference to the underlying substance of the claims at issue. *See* 535 U.S. at 645, 122 S.Ct. at 1760. This more expansive inquiry leads this Court to conclude that the equitable relief sought by Plaintiffs here contains a retrospective quality similar to that requested in both *Coeur d'Alene* and *Western Mohegan*. Significantly, the Prayer for Relief in the Complaint here identifies only the proposed injunction demanded by Plaintiffs, but lacks any description of the specific declaratory relief they seek. *See* Compl., WHEREFORE ¶ 1. But absent a declaration by the Court that Plaintiffs possess rights "to use ... the waters, fish[ ], tak[e] fish, and hold[ ] fish and shellfish in Shinnecock Bay and its estuary and other usual and customary Shinnecock fishing waters," *id.*, or similar rights, there would be no basis to enjoin Defendants from enforcing otherwise valid State fishing laws. Consequently, the Court reads Plaintiffs' Prayer for Relief as implicitly requesting a declaratory judgment to that effect. And, in the Court's view, an order granting such relief would be the functional equivalent of, or at least materially akin to, a declaration of quiet title. *Accord W. Mohegan*, 395 F.3d at 23 ("[T]he

2019 WL 117602

[t]ribe's claim is fundamentally inconsistent with the State of New York's exercise of fee title over the contested areas. To the extent that the complaint alleges that there has never been a lawful extinguishment of the [t]ribe's Indian title, it seeks a declaration from this court that New York's exercise of fee title remains subject to the [t]ribe's rights, *i.e.*, a determination that the lands in question are not even within the regulatory jurisdiction of the State." (citation and internal quotation marks omitted) ). As the allegations in the Complaint make clear, this case is principally a dispute over property rights. *See, e.g.*, Compl. ¶ 15 ("Colonial Deeds and related documents clearly support the right of the Shinnecock and other native peoples of eastern Long Island to fish in the waters adjacent to their communities without interference."); *id.* ¶ 16 ("Plaintiffs are in fear of exercising those same usual and customary aboriginal fishing rights secured and retained for them by their ancestors when Shinnecock territory was ceded to the English."); *id.* ¶ 22 ("Plaintiffs exercised their lawful rights to use waters, fish, take fish, and hold their fish clearly within an area of aboriginal usufructuary fishing rights un-relinquished and retained by Plaintiffs' ancestors in the aforementioned Colonial Deeds and related documents ceding Shinnecock territory...."). Plaintiffs' assertion that they do not seek "relief defining ownership or its equivalent," Pls.' Opp. to State Defs.' Mtn. at 9, is therefore unconvincing. To the contrary, as the State Defendants correctly point out, a ruling in Plaintiffs' favor would unquestionably "affect the [S]tate's sovereign interest and regulatory authority over its waters, along with its ability to regulate and protect its wildlife." State Defs.' Mem. at 5. It therefore stands to reason that, in accordance with *Coeur d'Alene* and *Western Mohegan*, the Eleventh Amendment bars Plaintiffs' claims for declaratory and injunctive relief against Farrish, Laczi and Seggos in their official capacities.

**\*11** To be sure, the Court acknowledges that *Coeur d'Alene, Western Mohegan*, and the instant case are distinguishable from one another, and that this case lacks some of the factual parallels to *Coeur d'Alene* that *Western Mohegan* possesses. In *Coeur d'Alene*, the nearest analogue to a conventional quiet title action, the tribe requested a declaration of its entitlement to exclusive use, occupancy and right to quiet enjoyment of the submerged lands in question. *See* 521 U.S. at 287-88, 117 S.Ct. at 2043. The tribe in *Western Mohegan*, by contrast, sought entitlement to a more limited property right, "Indian title," which, according to the tribe, included the rights "to camp, to

hunt, to fish, [and to] ... use the waters and timbers in the contested lands and waterways." *W. Mohegan*, 395 F.3d at 22 (internal quotations omitted). Despite those differences, the *Western Mohegan* court concluded that "the action [was] squarely governed by *Coeur d'Alene*," citing, among other considerations, the tribe's efforts to "exclude all others" from the subject lands. *Id.* at 23. Here, unlike the tribes in both *Coeur d'Alene* and *Western Mohegan*, Plaintiffs, albeit implicitly, seek a declaration of an even more limited right "to use ... the waters, fish[ ], tak[e] fish, and hold[ ] fish and shellfish in Shinnecock Bay and its estuary and other usual and customary Shinnecock fishing waters[,]" Compl., WHEREFORE ¶ 1, and they do not expressly seek to exclude all others from such areas. This Court, however, finds these distinctions inconsequential.

The attributes common to all three cases—particularly the states' sovereignty interests in regulating land and bodies of water within their boundaries—dictate that each should receive similar treatment for Eleventh Amendment purposes. To begin with, this case, like *Coeur d'Alene* and *Western Mohegan*, involves "core issues of land, state regulatory authority, and sovereignty...." *W. Mohegan*, 395 F.3d at 23. Moreover, just as the tribes did in *Coeur d'Alene* and *Western Mohegan*, Plaintiffs here are essentially seeking a declaration "that the [areas] in question are not even within the regulatory jurisdiction of the State." *Coeur d'Alene*, 521 U.S. at 282, 117 S.Ct. at 2040. As a result, if Plaintiffs were to prevail on their claim for a declaratory judgment, "substantially all benefits of ownership and control [of the waters at issue] would shift from the State to the [t]ribe," *id.*, and the State's "sovereign interest in its ... waters would be affected in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury," *id.* at 287, 117 S.Ct. at 2043. Finally, at issue here, as in *Coeur d'Alene*, are "lands underlying navigable waters[,]" which "have historically been considered sovereign lands" that "uniquely implicate sovereign interests." *Id.* at 283-84, 117 S.Ct. at 2041 (internal quotation marks and citation omitted). [14] In light of these "special circumstances," the Court concludes that this case is governed by *Coeur d'Alene.* Accordingly, the *Young* exception to Eleventh Amendment sovereign immunity does not apply to Plaintiffs' claims against Farrish, Laczi and Seggos in their official capacities. [15]

**\*12** Based on the foregoing analysis, the Court respectfully recommends that Plaintiffs' claims against the NYDEC, along with those against Farrish, Laczi and Seggos in their official capacities, be dismissed as barred by the Eleventh Amendment.[16]

### b. *Younger* Abstention

Assuming, *arguendo*, that the Eleventh Amendment did not apply, subject matter jurisdiction over Silva's claims against the State Defendants seeking to enjoin his criminal proceeding in the Justice Court would still be wanting under the *Younger* abstention doctrine. "*Younger* generally requires federal courts to abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings." *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002) (citing *Younger v. Harris*, 401 U.S. 37, 43-44, 91 S.Ct. 746, 755, 27 L.Ed.2d 669 (1971) ). Under *Younger* and its progeny, "abstention is appropriate when: 1) there is an ongoing state proceeding; 2) an important state interest is implicated; and 3) the plaintiff has an avenue open for review of constitutional claims in the state court." *Hansel v. Town Court for the Town of Springfield, N.Y.*, 56 F.3d 391, 393 (2d Cir. 1995). "The relevant question under *Younger* is 'whether the state's procedural remedies *could* provide the relief sought[,] [not] ... whether the state will provide' the constitutional ruling which the plaintiff seeks." *Spargo v. New York State Comm'n on Judicial Conduct*, 351 F.3d 65, 79 (2d Cir. 2003) (emphasis and second and third alterations in original) (quoting *Kirschner v. Klemons*, 225 F.3d 227, 235 (2d Cir. 2000) ).

Exceptions to *Younger* abstention should be made only on a "showing of bad faith, harassment, or ... other unusual circumstance," *Younger*, 401 U.S. at 54, 91 S.Ct. at 755, and the plaintiff bears the burden in this regard, *Diamond "D"*, 282 F.3d at 198. "A federal plaintiff seeking to establish that the bad faith exception to *Younger* applies must show that the party bringing the state action [has] no reasonable expectation of obtaining a favorable outcome, ... but rather brought the proceeding with a retaliatory, harassing, or other illegitimate motive." *Jackson Hewitt Tax Serv. Inc. v. Kirkland*, 455 F. App'x 16, 18 (2d Cir. 2012) (summary order) (brackets in original) (citations and internal quotations omitted). In evaluating an assertion of bad faith, "the subjective motivation of the state authority in bringing the proceeding is

critical to, if not determinative of, this inquiry." *Diamond "D"*, 282 F.3d at 199 (citations omitted). Hence, "[a] state proceeding that is legitimate in its purposes, but unconstitutional in its execution—even when the violations of constitutional rights are egregious—will not warrant the application of the bad faith exception." *Id.* (citation omitted). For the extraordinary circumstances exception to apply, a court must conclude: "(1) that there [is] no state remedy available to meaningfully, timely, and adequately remedy the alleged constitutional violation; and (2) that ... the litigant will suffer 'great and immediate' harm if the federal court does not intervene." *Id.* at 201 (citing *Trainor v. Hernandez*, 431 U.S. 434, 441-42 & n.7, 97 S.Ct. 1911, 1917 & n.7, 52 L.Ed.2d 486 (1977) ).

**\*13** In her Memorandum and Order dated July 31, 2018, Judge Feuerstein ruled that, under *Younger*, the Court was required to abstain from granting the injunctive relief requested by Silva. *See* DE [48] at 9. In reaching that conclusion, Judge Feuerstein reasoned that: (i) there was a pending State proceeding, namely, the subject criminal action against Silva in the Justice Court; (ii) that proceeding involved the "State's enforcement of its generally applicable fishing regulations outside of reservation boundaries, implicating an important state interest"; and (iii) there was no indication that Silva had been, or would be, deprived of "an adequate opportunity for judicial review of his constitutional claim." *Id.* (citations omitted). Judge Feuerstein also determined that neither exception to *Younger* applied. *Id.* at 9-10. Plaintiffs did not establish bad faith, Judge Feuerstein found, because there was no indication that either Farrish or Laczi intended to harass Silva by issuing him a criminal appearance ticket and seizing his property. *Id.* at 10. And according to Judge Feuerstein, Gerrod's and Jonathan's prosecutions were "too temporally attenuated to Silva's" to show a pattern of harassment or support a finding of retaliation or other nefarious purpose. *Id.* In addition, Judge Feuerstein concluded that no extraordinary circumstances existed, observing that "the trial before Judge Weber in [the] Justice Court provides Silva with a meaningful, timely, and adequate means to address his alleged constitutional violation[,] ... and there is nothing indicating [that] Silva will suffer 'great and immediate' harm" absent this Court's intervention. *Id.* (citations omitted).

Plaintiffs now submit that, despite Judge Feuerstein's ruling, the Court is not required to abstain because

the bad faith, harassment and exceptional circumstances exceptions to *Younger* apply. [17] *See* Pls.' Opp. to State Defs.' Mtn. at 11-15. Plaintiffs also assert that the *Younger* inquiry must be conducted "with[ ] reference to the Native American backdrop," and then appear to conflate the *Younger* inquiry with the *Ex parte Young* framework. *See id.* at 11-12. Having considered Plaintiffs' newly-asserted arguments, the Court finds no basis to depart from Judge Feuerstein's findings on this issue.

Setting aside conclusory allegations, the Complaint is devoid of any facts from which the Court could infer either that Defendants acted in bad faith or that exceptional circumstances exist. In their opposition brief, Plaintiffs identify Defendants' "failed prosecutions, seiz[ure] [of] property, and a continuing pattern of interference with [Plaintiffs'] aboriginal and retained Shinnecock fishing rights" as supporting their charge of bad faith. Pls.' Opp. to State Defs.' Mtn. at 13. But this conduct alone is insufficient to establish that Defendants somehow acted with intent to retaliate or harass, or with any other illegitimate purpose. The Complaint does not allege facts showing that the so-called failed prosecutions were commenced for any reason other than to enforce generally-applicable State laws pertaining to wildlife preservation. *See 333 E. 60th St., Inc. v. New York State Liquor Auth.*, No. 08-cv-4147, 2008 WL 4104012, at *4 (S.D.N.Y. Aug. 29, 2008) ("If the actions of [the] defendants were 'nothing more than a straightforward enforcement of the laws of New York, the case does not fall within the bad faith exception....' " (quoting *Diamond "D"*, 282 F.3d at 199 ). Insofar as Silva attempts to demonstrate bad faith by alleging selective prosecution, that theory also lacks factual support—such as, for instance, examples of preferential treatment of non-Indians who violated the same laws—and is undermined by Plaintiffs' reference in the Complaint to the prior prosecution of Ruggiero, a non-Indian, for violations of State fishing laws similar to those at issue here. *See* Compl. ¶ 17. The seizure of Plaintiffs' fishing equipment and catches is, without more, similarly insufficient to support a showing of bad faith, as criminal defendants' "personal effects are routinely ... 'seized,' and placed in official custody." *Hudson v. Palmer*, 468 U.S. 517, 540, 104 S.Ct. 3194, 3207, 82 L.Ed.2d 393 (1984). Further, because "[a] state proceeding that is legitimate in its purposes, but unconstitutional in its execution—even when the violations of constitutional rights are egregious—will not warrant the application of the bad

faith exception[,]" *Diamond "D"*, 282 F.3d at 199, the mere assertion that Defendants repeatedly interfered with Plaintiffs' aboriginal fishing rights in violation of the Supremacy Clause does not establish bad faith absent an accompanying, plausible allegation that they did so intentionally.

**\*14** Plaintiffs' final arguments on this point—that bad faith and harassment are demonstrated by Defendants' failure to consult with the Tribe on matters involving fishing rights consistent with obligations under Executive Order No. 13175, Consultation and Coordination With Indian Tribal Governments, Exec. Order No. 13175, 65 Fed. Reg. 67249, 2000 WL 34508356 (November 6, 2000), and by Defendants' reliance on purportedly inaccurate statements in the Gilmore Declaration, *see* Pls.' Opp. to State Defs.' Mtn. at 14 & n.7; *see also* DEs [59], [60]—also lack merit. Neither the cited Executive Order itself nor its import is referenced anywhere in the Complaint, and Plaintiffs have not otherwise established that Defendants' conduct violated any of that Order's provisions. [18] Even if it did, Plaintiffs have offered no support for the proposition that a state government official's contravention of a federal Executive Order necessarily amounts to bad faith for *Younger* purposes. Nor have Plaintiffs met their burden of showing bad faith by identifying assertions in the Gilmore Affidavit pertaining to the conservation status of the American Eel that are allegedly contradicted by statements on the NYDEC and U.S. Fish & Wildlife Service websites. Notably, Plaintiffs' supplemental submissions attacking the Gilmore Declaration simply rehash the arguments on this point first raised in Plaintiffs' opposition brief and thus add nothing new to their argument. The supplemental submissions similarly fail to support a finding of bad faith in any other respect. Accordingly, the Court recommends that Plaintiffs' claims seeking to enjoin Silva's criminal prosecution in the Justice Court be dismissed on the alternative basis that this Court lacks subject matter jurisdiction under *Younger*.

### c. Standing

As with Silva, there is an additional basis for dismissing Gerrod's and Jonathan's claims for declaratory and injunctive relief against the State Defendants—lack of standing. To establish standing, a plaintiff must satisfy three constitutional requirements: "(1) injury-in-fact—an

2019 WL 117602

injury that is 'concrete and particularized' and is 'actual or imminent, not conjectural or hypothetical'; (2) an injury that is fairly traceable to the challenged action; and (3) an injury that will likely be redressed by a favorable ruling of the court." *Berkson v. Gogo LLC*, 97 F.Supp.3d 359, 405 (E.D.N.Y. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) ); *see also Anjum v. J.C. Penney Co., Inc.*, No. 13-cv-460, 2014 WL 5090018, at *6 (E.D.N.Y. Oct. 9, 2014) ("Standing refers to the requirement that a plaintiff in federal court suffer a non-speculative injury-in-fact, traceable to the conduct of the defendant, and capable of redress by a favorable decision." (citation omitted) ).

"To establish injury-in-fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Spokeo, Inc. v. Robins*, 578 U.S. ——, ——, 136 S.Ct. 1540, 1548, 194 L.Ed.2d 635 (2016) (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136). For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1, 112 S.Ct. at 2136 n.1. "A 'concrete' injury must be 'de facto'; that is, it must actually exist." *Spokeo*, 578 U.S. at ——, 136 S.Ct. at 1548. The plaintiff must establish that he "has sustained or is immediately in danger of sustaining some direct injury ... [that] must be both real and immediate." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (citations and internal quotation marks omitted). "[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Id.* at 102, 103 S.Ct. at 1665 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974) ). Further, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm...." *Laird v. Tatum*, 408 U.S. 1, 13-14, 92 S.Ct. 2318, 2325-26, 33 L.Ed.2d 154 (1972). Redressability is the "non-speculative likelihood that the injury can be remedied by the requested relief." *W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008). "[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561, 112 S.Ct. at 2130 (citation and internal quotation marks omitted). "Relief that does not remedy the injury suffered

cannot bootstrap a plaintiff into federal court[.]" *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 107, 118 S.Ct. 1003, 1019, 140 L.Ed.2d 210 (1998).

**\*15** Judge Feuerstein previously determined, in her Memorandum and Order dated July 31, 2018, that Gerrod and Jonathan lacked standing because, according to the allegations in the Complaint, their prior prosecutions for violating State fishing laws were dismissed years ago and they are not currently facing criminal charges. *See* DE [48] at 10-11. In reaching that conclusion, Judge Feuerstein noted that their request for injunctive relief was "entirely speculative and remote, [and thus] insufficient to carry their burden of establishing that they have 'sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged official conduct.' " *Id.* at 11, 92 S.Ct. 2318, 2325-26 (quoting *Lyons*, 461 U.S. at 101-02, 103 S.Ct. at 1665). Once again, Plaintiffs have identified no compelling reason that Judge Feuerstein's ruling pertaining to Gerrod's and Jonathan's standing to seeking a preliminary injunction should not govern in the context of their remaining equitable claims. Accordingly, as Gerrod and Jonathan have failed to establish a concrete and particularized injury that can be redressed by a decision in their favor, the Court respectfully recommends that their claims for declaratory and injunctive relief be dismissed for lack of standing.[19]

### d. Failure to State a Claim – 42 U.S.C. §§ 1981 and 1982

Having found untenable Plaintiffs' claims for declaratory and injunctive relief against the State Defendants, as well as Plaintiffs' claims for monetary damages against the NYDEC and Farrish, Laczi and Seggos in their official capacities, the Court next evaluates the merits of Plaintiffs' claims for monetary damages under 42 U.S.C. §§ 1981 and 1982 against Farrish, Laczi and Seggos in their individual capacities.[20] Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the

security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. Similarly, pursuant to § 1982, "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982; see Costello v. Town of Huntington, No. 14-cv-2061, 2015 WL 1396448, at *12 (E.D.N.Y. Mar. 25, 2015) ("Section 1981 establishes that all persons have equal right to make and enforce contracts, while § 1982 establishes that all persons have equal right to purchase, lease, sell, hold, and convey real and personal property." (citing 42 U.S.C. §§ 1981, 1982) ). To state a *prima facie* claim under either provision, plaintiffs may allege: "(1) they are members of a racial minority; (2) an intent to discriminate on the basis of their race by defendant; and (3) the discrimination concerned one or more activities enumerated in §§ 1981 or 1982, *e.g.*, making contracts or the purchase of personal property." Costello, 2015 WL 1396448, at *12 (citation and internal quotation marks omitted). [21]

### i. Discriminatory Intent

**\*16** Plaintiffs asserting claims under both § 1981 and § 1982 "must allege facts supporting the [defendant]'s intent to discriminate against [them] on the basis of [their] race." Sherman v. Town of Chester, 752 F.3d 554, 567 (2d Cir. 2014); see Griffin v. Santander Bank, No. 12-cv-1249, 2014 WL 204229, at *5 (E.D.N.Y. Jan. 16, 2014) ("[C]laims brought under §§ 1981 and 1982 require a showing of discriminatory intent." (alteration in original) (citation omitted) ); Perry v. State of New York, No. 08-cv-4610, 2009 WL 2575713, at *2 (S.D.N.Y. Aug. 20, 2009) ("A plaintiff is required to set forth factual circumstances from which discriminatory motive can be inferred.... In the absence of such allegations, dismissal at the pleading stage is warranted." (internal citations omitted) ). "In order to show a discriminatory intent, '[t]he events of intentional and purposeful discrimination, as well as the racial animus constituting the motivating factor for [the] [defendant]'s actions, must be specifically

pleaded in the complaint.' " Griffin, 2014 WL 204229, at *5 (first and third alterations in original) (quoting Shen v. A&P Food Stores, No. 93-cv-1184, 1995 WL 728416, at *3 (E.D.N.Y. Nov. 21, 1995) ); see Grajales v. Mendez, No. 11-cv-3069, 2011 WL 3163032, at *1 (E.D.N.Y. July 25, 2011) ("Plaintiff must ... allege that [the] defendants' actions were purposefully discriminatory and racially motivated." (citations omitted) ). "Thus, '[f]act-specific allegations of a causal link between the defendant's actions and the plaintiff's race are required,' and '[c]onclusory or naked allegations will not suffice.' " Grimes v. Fremont Gen. Corp., 785 F.Supp.2d 269, 296 (S.D.N.Y. 2011) (alterations in original) (quoting Dove v. Fordham Univ., 56 F.Supp.2d 330, 338 (S.D.N.Y. 1999), aff'd sub nom. Dove v. O'Hare, 210 F.3d 354 (2d Cir. 2000) ).

Here, the Complaint falls considerably short of alleging facts from which the Court could infer that either Farrish, Laczi or Seggos acted with discriminatory intent. As Plaintiffs concede in their opposition brief, see Pls.' Opp. to State Defs.' Mtn. at 23, the only actions they rely upon in support of their charge of discrimination are: (i) the prosecution of Ruggiero in or around 2008, see Compl. ¶ 17; (ii) the prosecution of Gerrod in or around 2008, see id. ¶ 18; (iii) the prosecution of Jonathan in or around 2010, see id. ¶ 19; and (iv) the ticketing of Silva and seizure of his fishing equipment and catch by Farrish and Laczi in 2017, along with Silva's subsequent prosecution, see Compl. ¶ 20. Initially, the claims under §§ 1981 and 1982 fail because the Complaint pleads no facts demonstrating that Plaintiffs were treated less favorably than white citizens with respect to any contractual or property right. In fact, as indicated above in the context of this Court's discussion of the bad faith exception to the Younger abstention doctrine, the State's prosecution of Ruggiero, a non-Indian, for violating State fishing laws actually weakens Plaintiffs' claim of discrimination. But even assuming, *arguendo*, that the State Defendants had enforced State fishing laws in a discriminatory manner, even the most liberal reading of Plaintiffs' allegations does not suggest that Farrish, Laczi or Seggos were motivated by racial animus. Based on the Complaint's allegations, the Court can infer only that Farrish and Laczi were acting consistent with their obligations to enforce generally-applicable State fishing laws. [22] Moreover, as explained further below, the Complaint lacks any allegations pertaining to Seggos specifically. Accordingly, the Court recommends that Plaintiffs' cause of action under 42

2019 WL 117602

U.S.C. §§ 1981 and 1982 against Farrish, Laczi and Seggos in their individual capacities are dismissed for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). [23]

### ii. Personal Involvement of Seggos

**\*17** Plaintiffs' claims against Seggos in his individual capacity must also be dismissed for failure to allege his personal involvement in any of the purportedly unlawful conduct. See *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) ("A claim seeking personal liability under [§] 1981 must be predicated on the actor's personal involvement." (citation omitted) ); *Ebersole v. Pennsylvania Dep't of Corr.*, No. 4:06-cv-1368, 2009 WL 1010521, at \*3 (M.D. Pa. Apr. 14, 2009) (dismissing § 1982 claims against government officials for failure to establish their personal involvement in the alleged violation); *see also CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 447, 128 S.Ct. 1951, 1955, 170 L.Ed.2d 864 (2008) (observing that Supreme Court precedents have "have long construed §§ 1981 and 1982 similarly"). Plaintiffs' argument that their claims against Seggos are viable because, as Commissioner of the NYDEC, he "sets policy and sees to it that it is executed," Pls.' Opp. to State Defs.' Mtn. at 24, is unfounded. An allegation to that effect is not made in the Complaint and, in any event, it would lack adequate detail concerning Seggos's role in the specific conduct at issue here to satisfy the applicable pleading standard. Therefore, the Court recommends that Plaintiffs' claims under 42 U.S.C. §§ 1981 and 1982 against Seggos in his individual capacity be dismissed on this alternative basis.

### 2. The County Defendants

The Court next turns to Plaintiffs' claims against the County Defendants. In support of their motion to dismiss, the County Defendants argue that: (i) Plaintiffs' claims against Greenwood in her individual capacity are barred based on the theory of absolute prosecutorial immunity. *See* Defendants Jamie Greenwood and Suffolk County District Attorney's Office Memorandum of Law in Support of Their Motion to Dismiss Pursuant to Fed. R. Civ. P. Rule 12(b)(6) ("County Def.'s Mem."), DE [54-3], at 2-5; (ii) the claims against Greenwood in her official capacity must be construed as against the State and thus dismissed under the doctrine of sovereign

immunity, *see id.* at 6-9, 92 S.Ct. 2318, 2325-26; (iii) the SCDA is not an entity susceptible to suit, *see id.* at 10, 92 S.Ct. 2318, 2325-26; (iv) to the extent that Plaintiffs' claims are construed as against the County of Suffolk (the "County"), they must be dismissed both because the County cannot be liable for actions of the District Attorney and for failure to sufficiently plead that the alleged conduct was the result of a practice or custom, *see id.* at 6-10, 92 S.Ct. 2318, 2325-26; and (v) Plaintiffs' claim under the Declaratory Judgment Act must be dismissed for failure to allege real or immediate harm, *see id.* at 11-13, 92 S.Ct. 2318, 2325-26. The Court agrees with the County Defendants that Greenwood is entitled to absolute prosecutorial immunity, that the SCDA is not an entity susceptible to suit, and that Plaintiffs' claims should not be construed as against the County. Based on these as well as the other conclusions herein, the Court need not address the County Defendants' remaining arguments.

### a. Claims Against Greenwood

It is well settled that a prosecutor enjoys absolute immunity from a civil suit premised on the "initiation and pursuit of a criminal prosecution" and for any acts taken in "present[ing] ... the [s]tate's case at trial." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269, 113 S.Ct. 2606, 2613, 125 L.Ed.2d 209 (1993); *see Imbler v. Pachtman*, 424 U.S. 409, 430-31, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976). In other words, a state prosecutor enjoys absolute immunity when engaged in activities "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430, 96 S.Ct. at 995; *see also Day v. Morgenthau*, 909 F.2d 75, 77 (2d Cir. 1990). The purpose of the immunity doctrine is " 'to preserve the integrity of the judicial process' and to enable 'zealous[ ] perform[ance of] prosecutorial duties ... [without] the constant threat of legal reprisals.' " *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1147 (2d Cir. 1995) (alterations in original) (quoting *Hill v. City of New York*, 45 F.3d 653, 656 (2d Cir. 1995) ).

In determining whether prosecutorial immunity is available, courts employ a "functional approach" that "looks to the nature of the function performed, not the identity of the actor who performed it." *Buckley*, 509 U.S. at 269, 113 S.Ct. at 2613 (citations and internal quotation marks omitted); *see also Parkinson v. Cozzolino*, 238 F.3d 145, 150 (2d Cir. 2001) ("The actions of a prosecutor are not covered by absolute immunity merely

because they were performed by a prosecutor; rather, the question is whether the actions are part of a prosecutor's traditional functions." (citation and internal quotation marks omitted) ). Whether a prosecutor "may be sheltered by absolute immunity from liability for [her conduct] turns on whether or not [her conduct] occurred in the course of [her] role as an advocate." *Hill*, 45 F.3d at 662; *See Warney v. Monroe Cty.*, 587 F.3d 113, 121 (2d Cir. 2009) ("Those acts that are 'intimately associated with the judicial phase of the criminal process' would be shielded by absolute immunity, but not 'those aspects of the prosecutor's responsibility that cast [her] in the role of an administrator or investigative officer rather than that of advocate.' " (quoting *Imbler*, 424 U.S. at 430-31, 96 S.Ct. at 995) ). A prosecutor's role as an advocate encompasses "actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Imbler*, 424 U.S. at 431 n.33, 96 S.Ct. at 996 n.33. "Conversely, where a prosecutor acts without any colorable claim of authority, [s]he loses the absolute immunity [s]he would otherwise enjoy." *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987); *see Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) ("[T]he prosecutor has absolute immunity for the initiation and conduct of a prosecution 'unless [she] proceeds in the clear absence of all jurisdiction[.]' " (quoting *Barr*, 810 F.2d at 361) ). "The scope of a prosecutor's jurisdiction is determined by law[,]" with reference to "whether the pertinent statutes may have authorized prosecution for the charged conduct[.]" *Shmueli* 424 F.3d at 237 (citations omitted).

 **\*18** Here, Plaintiffs' claims for monetary damages against Greenwood in her individual capacity—namely, those asserted under 42 U.S.C. §§ 1981[24] and 1982—are foreclosed by the doctrine of absolute prosecutorial immunity.[25] As noted above, Greenwood is the Assistant District Attorney handling the State's prosecution of Silva in the Justice Court for his alleged violations of State fishing and environmental conservation laws. *See* Compl. ¶ 20. Only one paragraph of the Complaint contains allegations pertaining to Greenwood specifically:

> [The criminal case against Silva] is presently lodged and pending in the ... Justice Court as Case No. 17-7008 and is being prosecuted by Greenwood. Silva's attempt to obtain a voluntary dismissal by

Greenwood was unsuccessful, and Silva's motion to dismiss for lack of jurisdiction was denied by that court. Over Silva's objection, that case is presently scheduled for trial on August 30, 2018 at 9:00 am.

*Id.* More generally, the Complaint asserts that Plaintiffs "have been ... prosecuted by the Defendants[ ] and are deterred and chilled from exercising their rights to fish by the acts of the Defendants." *Id.* ¶ 14; *see also id.* ¶ 16 ("Over the last decade, Defendants have ... prosecuted the Plaintiffs for alleged criminal offenses in alleged violation of New York State law involving fishing and raising shellfish in Shinnecock Bay and its estuary waters.... Each of the prosecutions failed[;] [y]et, the Defendants persist and continue to ... threaten prosecution.").

Even when viewed in the light most favorable to Plaintiffs, the allegations in the Complaint concerning Greenwood suggest that her conduct was "intimately associated with the judicial phase of the criminal process," *Imbler*, 424 U.S. at 430, 96 S.Ct. at 995, and hence, occurred as part of her traditional function as a prosecutor. *See Fielding v. Tollaksen*, 257 F. App'x 400, 401 (2d Cir. 2007) (summary order). That is, the Complaint merely states that Greenwood has been responsible for prosecuting Silva's case in the pre-trial stages—*i.e.*, acting in her role as an advocate on behalf of the State—but lacks allegations, even implicit, that any of Greenwood's actions were undertaken in the capacity of an administrator or investigative officer. Nor does the Complaint plead facts demonstrating that Greenwood's conduct with respect to Silva's prosecution was outside the scope of her role as an advocate. Indeed, even Plaintiffs' allegation regarding Defendants' "threaten[ed] prosecution[s,]" Compl. ¶ 16, is insufficient in that regard. *Cf. Taylor v. Kavanagh*, 640 F.2d 450, 453 (2d Cir. 1981) (holding that a prosecutor's activities in the plea bargaining context warrant the protection of absolute immunity).

Similarly absent from the Complaint are any allegations from which the Court can infer that Greenwood has operated in the "clear absence of all jurisdiction." *Shmueli*, 424 F.3d at 237 (quoting *Barr*, 810 F.2d at 361). Article 18 of the New York County Law provides that "it shall be the duty of every district attorney to conduct all prosecutions for crimes and offenses cognizable by the

courts of the county for which he or she shall have been elected or appointed[.]" N.Y. County Law § 700. Greenwood, as an Assistant District Attorney, is thus plainly authorized by statute to commence prosecutions. To that end, Greenwood, in exercising that mandate on behalf of the State, has brought criminal charges under various State laws applicable to Silva's conduct, namely, NYECL § 13-0355 and NYCRR, title 6, §§ 40-1(b)(ii)-(iii). The Court therefore finds no basis to conclude that Greenwood acted without any colorable claim of authority.

**\*19** Accordingly, the doctrine of absolute prosecutorial immunity bars the claims for monetary damages against Greenwood in her individual capacity. Moreover, the Court agrees with the County Defendants that, because Greenwood was acting in her role as a prosecutor, the official capacity claims against her must be construed as against the State. See *Ying Jing Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir. 1993) ("When prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county.") (quoting *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988), *cert. denied*, 488 U.S. 1014, 109 S.Ct. 805, 102 L.Ed.2d 796 (1989) ); *see also Greene v. City of New York*, No. 08-cv-00243, 2017 WL 1030707, at \*29 (E.D.N.Y. Mar. 15, 2017), *aff'd*, 742 F. App'x 532 (2d Cir. 2018). For the reasons set forth in section III(B)(1)(a), *supra*, those claims are barred by the Eleventh Amendment. See *D'Alessandro v. City of New York*, 713 F. App'x 1, 8 (2d Cir. 2017) (summary order) ("[I]f a district attorney or an assistant district attorney acts as a prosecutor, she is an agent of the State, and therefore immune from suit in her official capacity." (citations omitted) ). Finally, Plaintiffs' claims for declaratory and injunctive relief against Greenwood in her official capacity are, as explained in sections III(B)(1)(b) and (c), *supra*, independently precluded under *Younger* and for lack of standing. [26]

### b. Claims Against the SCDA

Plaintiffs' claims against the SCDA fare no better. "[U]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and[,] therefore, cannot sue or be sued." *Leshore v. Comm'r of Long Beach P.D.*, No. 10-cv-6067, 2012 WL 1032643, at \*7 (E.D.N.Y. Mar. 21, 2012) (alteration in original) (citation omitted). It is therefore well-settled that district attorneys' offices in New York lack the capacity to be sued. *See, e.g., Boley v. DeVito*, No. 12-cv-4090, 2012 WL 3764493, at \*2 (E.D.N.Y. Aug. 27, 2012) ("The Kings County District Attorney's Office is not a suable entity."); *Bristol v. Prob. Dep't of Nassau Cty.*, No. 14-cv-6647, 2016 WL 873336, at \*1 n.1 (E.D.N.Y. Mar. 8, 2016) (collecting cases).

Plaintiffs assert that the SCDA is indeed a legal entity separate from the County and capable of being sued because the County provides the SCDA with a "prosecution fund" and the SCDA holds itself out to the public on its website as "an entity capable of holding intellectual property rights." Pls.' Opp. to County Defs.' Mtn. at 8-9. But Plaintiffs identify no legal support for their theory that these characteristics have any bearing on the SCDA's status as an "administrative arm" of the County. Absent authority suggesting otherwise, this Court will apply the uniformly-recognized principle that district attorneys' offices in New York are not subject to suit. Accordingly, the Court respectfully recommends that Plaintiffs' claims against the SCDA be dismissed. [27]

### c. County Liability for Prosecutorial Acts

The Court also rejects the notion that either the claims against Greenwood in her official capacity or those against the SCDA should be construed as claims against the County. As noted above, "a county cannot be liable for the acts of a district attorney related to the decision to prosecute or not prosecute an individual." *Martin v. Cty. of Suffolk*, No. 13-cv-2104, 2014 WL 1232906, at \*5 (E.D.N.Y. Mar. 26, 2014) (citations omitted); *see also Jones v. City of New York*, 988 F.Supp.2d 305, 314-17 (E.D.N.Y. 2013). "With respect, however, to claims centering not on decisions whether or not, and on what charges, to prosecute but rather on the administration of the district attorney's office, the district attorney has been treated not as a state official but rather as an official of the municipality to which he is assigned." *Ying Jing Gan*, 996 F.2d at 536. Examples of such administrative decisions include "building management, maintenance decisions, or discrimination against employees[.]" *Jones*, 988 F.Supp.2d at 316. Here, Plaintiffs' claims against the County Defendants deal exclusively with the latter's prosecutorial conduct in connection with Silva's case in the Justice Court. That is to say, there are no allegations in

the Complaint suggesting that Plaintiffs' claims somehow arise from the County Defendants' administrative acts such that the County Defendants could be considered municipal actors. Accordingly, the Court recommends that neither Plaintiffs' claims against Greenwood nor those against the SCDA be construed as asserted against the County. [28]

### C. Leave to Amend

**\*20** While leave to amend a complaint should be freely given "when justice so requires[,]" Fed. R. Civ. P. 15(a) (2), it is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citations omitted). "[A] district court may deny leave to amend when ... amendment would be futile because the problem with the claim 'is substantive ... [and] better pleading will not cure it.' " *Reynolds v. City of Mount Vernon*, 14-cv-1481, 2015 WL 1514894, at \*5 (S.D.N.Y. Apr. 1, 2015) (second and third alterations in original) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ). Here, the Court recommends that Plaintiffs be granted leave to replead only their statutory claims for monetary damages against Farrish, Laczi and Seggos in their individual capacities, but that they otherwise be denied leave to amend their Complaint. As an initial matter, Plaintiffs have not requested leave to amend in the event of dismissal. *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 126 (2d Cir. 2013) ("While leave to amend under the Federal Rules of Civil Procedure is freely granted, ... no court can be said to have erred in failing to grant a request that was not made." (citations and internal quotation marks omitted) ). Further, based on the findings above, amendment of Plaintiffs' claims for injunctive and declaratory relief and their statutory claims against the NYDEC and the County Defendants, would be futile in light of the numerous substantive deficiencies that could not be cured through supplemental pleading. [29] The Court cannot, however, conclude with certainty that amendment of Plaintiffs' statutory claims against Farrish, Laczi and Seggos in their individual capacities would be futile. [30] Accordingly, the Court recommends that Plaintiffs be granted leave to amend only to this limited extent.

### IV. CONCLUSION

For the reasons set forth above, the Court respectfully recommends that Plaintiffs' motion for leave to file a sur-reply be granted, but that Defendants' motions to dismiss nevertheless be granted and the Complaint be dismissed in its entirety. However, the Court further recommends that Plaintiffs be granted leave to replead, but only as to their statutory claims for monetary damages against Farrish, Laczi and Seggos in their individual capacities.

### V. OBJECTIONS

A copy of this Report and Recommendation is being served on all parties by electronic filing on the date below. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b) (1); Fed. R. Civ. P. 6(a), 72; *Ferrer v. Woliver*, No. 05-3696, 2008 WL 4951035, at \*2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

### All Citations

Slip Copy, 2019 WL 117602

Footnotes

1   Plaintiffs' claims are asserted against Farrish, Greenwood, Laczi and Seggos in both their individual and official capacities. *See* Compl. ¶¶ 5-8; 21-25.

2   Unless otherwise indicated, the facts set forth herein are taken from the Complaint and judicially noticeable materials, and are accepted as true for purposes of the instant motions.

3   The Federally Recognized Indian Tribe List Act of 1994 (the "Act"), Pub.L. No. 103-454, 108 Stat. 4791, defines "Indian tribe" as "any Indian or Alaska Native tribe, band, nation, pueblo, village or community that the Secretary of the Interior acknowledges to exist as an Indian tribe." 25 U.S.C. § 5130. Pursuant to the Act, the Secretary of the Interior "shall publish in the Federal Register a list of all Indian tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians." *Id.* § 5131.

4      According to James Gilmore, Director of the Division of Marine Resources at the NYDEC, juvenile American Eel are known as "elvers" or "glass eels" due to their transparency. *See* Declaration of James Gilmore (the "Gilmore Declaration"), DE [47], ¶ 4. The Court includes this information solely as background.

5      The Complaint does not allege that Seggos, Commissioner of the NYDEC, *see* Compl. ¶ 8, was personally involved in the ticketing or prosecution of any Plaintiff.

6      Several months after filing this action, Plaintiffs notified this Court by letter that Silva's trial in the Justice Court commenced as scheduled on August 30, 2018, but was then continued to October 25, 2018. *See* DEs [57], [60]. The parties have not since updated the Court on the status of Silva's Justice Court proceedings.

7      Notably, the Complaint contains no allegation that any of the Defendants interfered with Plaintiffs' on-Reservation fishing rights, and Plaintiffs do not otherwise assert that any of Defendants' conduct occurred on the Reservation. To the contrary, the Complaint describes the waters at issue as "adjacent to the lands of the Shinnecock Indian Reservation." Compl. ¶ 16. Moreover, the County Defendants have previously conceded in this action that Plaintiffs have a right to fish within the boundaries of the Reservation. *See* DE [44] at 2 n.2.

8      It is well established that federally-recognized Indian tribes and their members are subject to the Eleventh Amendment. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 268, 117 S.Ct. 2028, 2033, 138 L.Ed.2d 438 (1997).

9      The Court is mindful that the question of "whether the claim of sovereign immunity [under the Eleventh Amendment] constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense" has not been definitively answered by the Supreme Court or the Second Circuit. *Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013) (citing *Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 391, 118 S.Ct. 2047, 2053, 141 L.Ed.2d 364 (1998) ); *see Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 237-39 (2d Cir. 2006) (holding that the burden of proof regarding sovereign immunity rests on the party asserting it as is true of affirmative defenses generally). However, the Supreme Court repeatedly and recently has discussed the Eleventh Amendment as a jurisdictional bar and has confirmed that a state's sovereign immunity conferred by it can be raised for the first time on appeal. *See Woods*, 466 F.3d at 237-38 (collecting cases). Both holdings are consistent with the issue being essentially jurisdictional in nature. *See id.* Because the exact characterization of Eleventh Amendment immunity does not substantively impact this Report and Recommendation, the Court assumes the immunity inquiry to be a jurisdictional one and does not analyze the issue further.

10     As alluded to above, courts have recognized two additional exceptions to Eleventh Amendment immunity, neither of which applies here. First, "a State may waive its sovereign immunity by consenting to suit." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670, 119 S.Ct. 2219, 2223, 144 L.Ed.2d 605 (1999) (citing *Clark v. Barnard*, 108 U.S. 436, 447-48, 2 S.Ct. 878, 27 L.Ed. 780 (1883) ). Second, "Congress may abrogate the sovereign immunity of the States by acting pursuant to a grant of constitutional authority." *Winokur v. Office of Court Admin.*, 190 F.Supp.2d 444, 448 (E.D.N.Y. 2002) (citing *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 80, 120 S.Ct. 631, 644, 145 L.Ed.2d 522 (2000) ).

11     As the United States Court of Appeals for the Tenth Circuit has observed, it remains unclear precisely why Justice O'Connor agreed with Justice Kennedy's conclusion in *Coeur d'Alene* that the suit should be dismissed, notwithstanding the complaint's "seeming compliance with *Ex parte Young's* formalisms." *Hill v. Kemp*, 478 F.3d 1236, 1258 (10th Cir. 2007). This Court finds convincing the *Hill* court's theory concerning Justice O'Connor's approach to *Young*: "Justice O'Connor seemed to suggest that we must assess whether a claim seeks relief effectively equivalent to a retrospective judgment regardless of how it is formally pled or denominated." *Id.*

12     Neither the Supreme Court nor the Second Circuit has provided further guidance regarding the scope of the *Coeur d'Alene* exception to *Young* as it applies to disputes over property rights involving Indian tribes, or their members, and states.

13     The Court is cognizant of the Supreme Court's holding in *Jett v. Dallas Independent School District* that the remedial provisions of § 1983 constitute the exclusive federal remedy for violations by state actors of rights enumerated in § 1981. *See* 491 U.S. 701, 731, 109 S.Ct. 2702, 2721, 105 L.Ed.2d 598 (1989) ("We think the history of the 1866 Act and the 1871 Act recounted above indicates that Congress intended that the explicit remedial provisions of § 1983 be controlling in the context of damages actions brought against state actors alleging violation of the rights declared in § 1981."). Though some courts have suggested that § 1981(c), which was added as part of the Civil Rights Act of 1991, statutorily overruled *Jett* by creating a private right of action against state actors, the Second Circuit has since unequivocally rejected that theory and held that "§ 1983 provides the sole cause of action available against state actors alleged to have violated § 1981." *Duplan v. City of New York*, 888 F.3d 612, 616 (2d Cir. 2018). Here, however, the proper construction of Plaintiffs' § 1981 claims is of no moment for purposes of the Court's sovereign immunity analysis, because "Congress has not abrogated sovereign immunity from claims brought under 42 U.S.C. § 1981 [or §] 1983 ..., nor has New York waived

immunity with respect to such claims." *Allah v. City of New York*, No. 15-cv-6852, 2016 WL 676394, at *3 (E.D.N.Y. Feb. 17, 2016). Similarly, although the Court has found no cases in the Second Circuit addressing this issue with respect to § 1982 claims, the weight of authority in other circuits suggests that Congress did not intend to abrogate state sovereign immunity from such claims, *see Tariq-Shuaib v. City of Camden*, No. 09-4760, 2011 WL 383857, at *3 (D.N.J. Feb. 3, 2011) (collecting cases), and further, there is no indication that the State has waived its immunity by way of "clear declaration," *McGinty*, 251 F.3d at 93.

14    As the Supreme Court observed in *Coeur d'Alene*:

> The importance of [submerged] lands to state sovereignty explains our longstanding commitment to the principle that the United States is presumed to have held navigable waters in acquired territory for the ultimate benefit of future [s]tates and "that disposals by the United States during the territorial period are not lightly to be inferred, and should not be regarded as intended unless the intention was definitely declared or otherwise made very plain."

> 521 U.S. 261, 283-84, 117 S.Ct. at 2041, 138 L.Ed.2d 438 (quoting *United States v. Holt State Bank*, 270 U.S. 49, 55, 46 S.Ct. 197, 199, 70 L.Ed. 465 (1926) ).

15    The cases relied upon by Plaintiffs in support of their preemption argument are inapposite. *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), *United States v. State of Washington*, 384 F.Supp. 312 (W.D. Wash. 1974), *aff'd and remanded*, 520 F.2d 676 (9th Cir. 1975), and *United States v. State of Michigan*, 471 F.Supp. 192 (W.D. Mich. 1979) were decided well before *Coeur d'Alene*, did not address the issue of sovereign immunity, and, unlike this case, involved fishing rights expressly granted to or preserved by the tribes through treaty. Further, the court in *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1205-06 (10th Cir. 2002) held only that the *Ex parte Young* exception applied to the tribe's claim seeking to enjoin the state from prosecuting tribe members for actions taken within reservation boundaries. Here, however, there are no allegations that the conduct giving rise to Plaintiffs' claims occurred on the Reservation.

16    Although the parties do not address this issue in their briefing, to the extent that Plaintiffs assert claims for injunctive and declaratory relief as against Farrish, Laczi and Seggos in their individual capacities, the Court recommends that those claims be dismissed as improper. *See Nassau & Suffolk Cty. Taxi Owners Ass'n, Inc. v. State*, 336 F.Supp.3d 50, 69-70 (E.D.N.Y. 2018) (citing *Kuck v. Danaher*, 822 F.Supp.2d 109, 143 (D. Conn. 2011) ) (dismissing individual-capacity claims for injunctive relief against government officials because the officials could provide the relief sought by the plaintiffs only in their official capacities); *see also Boddie v. New York State Div. of Parole*, No. 08-cv-911, 2009 WL 1033786, at *6 (E.D.N.Y. Apr. 17, 2009) ("Neither Judge Campbell nor Ms. Thompson in their *individual capacities* has the power or the authority to effectuate an order from this court granting plaintiff the prospective declaratory or injunctive relief he seeks in his sixth and seventh causes of action." (emphasis in original) ), *opinion modified on denial of reconsideration*, 2009 WL 1938981 (E.D.N.Y. July 7, 2009).

17    Plaintiffs claim that they "did not have an opportunity to argue the *Younger* bad faith and harassment exceptions in response to the Defendants' opposition papers to Plaintiffs' motion for [a] preliminary injunction[ ] because the Court's docket entry show cause order did not provide for reply papers and stated no oral argument would be held." Pls.' Opp. to State Defs.' Mtn. at 11 n.6. As explained above, however, Judge Feuerstein nonetheless addressed, and found inapplicable, any potential exceptions to *Younger* in her Memorandum and Order dated July 31, 2018. *See* DE [48] at 9-10.

18    In light of Plaintiffs' failure to explain how the exceptional circumstances exception to *Younger* applies here, the Court will not address that issue in any further detail. Additionally, because Plaintiffs neglect to articulate why the "Native American backdrop" against which this case arises, *see* Pls.' Opp. to State Defs.' Mtn. at 11, should alter the Court's *Younger* analysis, that argument is rejected as well.

19    The Court agrees with the State Defendants that, for the same reasons Gerrod and Jonathan lack standing, Silva's attempt to enjoin Defendants from interfering with his future use of the waters in question must fail. *See* State Defs.' Mem. at 9. Accordingly, to the extent that this component of Silva's claim for injunctive relief is not barred under *Younger*, the Court also recommends that it be deemed precluded based on his lack of standing.

20    Again, the Court acknowledges that "§ 1981 does not provide a separate private right of action against state actors" *Duplan*, 888 F.3d at 621, and that, instead, "§ 1983 provides the sole cause of action available against state actors alleged to have violated § 1981[,]" *id.* at 616. *See also Jett*, 491 U.S. at 731, 109 S.Ct. at 2721. "The holding in *Jett* has been interpreted [by courts in the Second Circuit] to encompass not only governmental entities, but also individuals sued in their individual capacities who are state actors[,]" *Wilson v. New York*, No. 15-cv-23, 2017 WL 9674497, at *18 (E.D.N.Y. Jan. 24, 2017), *report and recommendation adopted*, 2018 WL 1466770 (E.D.N.Y. Mar. 26, 2018), such as Farrish, Laczi and Seggos. Consequently, Plaintiffs' claims under § 1981 against Farrish, Laczi and Seggos in their individual capacities

should, as a technical matter, be summarily dismissed. But in the interest of judicial efficiency, this Court recommends construing the § 1981 claims as having been properly asserted under § 1983, as this approach does not materially impact the remaining recommendations herein. 42 U.S.C. § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

42 U.S.C. § 1983. Although § 1983 itself does not create substantive rights, it does provide "a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). To prevail on a claim arising under § 1983, a plaintiff must demonstrate: "(1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law." *Hawkins v. Nassau Cty. Corr. Facility*, 781 F.Supp.2d 107, 111 (E.D.N.Y. 2011) (citing 42 U.S.C. § 1983). Thus, because Plaintiffs seek to vindicate rights provided by § 1981, the Court must analyze their claims in the same manner irrespective of whether they are interpreted as independent § 1981 claims or claims under § 1983.

21    Claims under §§ 1981 and 1982 may also be based on reverse discrimination, meaning that a white plaintiff may maintain a claim based on his or her race. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286-87, 96 S.Ct. 2574, 2582, 49 L.Ed.2d 493 (1976) (Section 1981); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969) (Section 1982).

22    The Court would reach the same result even if it were to consider Plaintiffs' supplemental submissions in evaluating the Fed. R. Civ. P. 12(b)(6) component of the State Defendants' motion. No inference that Farrish, Laczi or Seggos acted with discriminatory intent can be drawn from either the allegedly inaccurate statements in the Gilmore Declaration or the two emails involving Gilmore. *See* DEs [59], [60].

23    Based on the allegations in the Complaint, Gerrod's and Jonathan's claims under §§ 1981 and 1982 also appear to be time barred. The allegedly unlawful conduct giving rise to their claims—*i.e.*, their respective prosecutions—occurred in or around 2009 and 2010. Whether the Court applies a three- or four-year statute of limitations, *see Bacon v. Suffolk Legislature*, No. 05-cv-4307, 2007 WL 2288044, at *5-6 (E.D.N.Y. Aug. 8, 2007) (discussing statute of limitations periods for claims under §§ 1981, 1982 and 1983), the time to commence an action predicated on such conduct expired long before this case was initiated in 2018. Yet, in view of this Court's recommendation that Plaintiffs be granted leave to replead their statutory claims against Farrish, Laczi and Seggos in their individual capacities, the Court need not further address the issue of timeliness at this juncture.

24    For the reasons explained above, Plaintiffs' claims under § 1981 against Greenwood in her individual capacity are improper under *Duplan*. Yet, as with those § 1981 claims asserted against Farrish, Laczi and Seggos in their individual capacities, the Court recommends, in the interest of judicial economy, that such claims against Greenwood be construed as having been brought under § 1983 so that the Court may address their merits, and because doing so does not impact any other recommendation herein.

25    It is well settled that prosecutors are not entitled to absolute immunity from claims for injunctive and declaratory relief. *See Supreme Court of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 736-37, 100 S.Ct. 1967, 1977, 64 L.Ed.2d 641 (1980).

26    Consistent with this Court's determination with regard to any claims for injunctive and declaratory relief as against Farrish, Laczi and Seggos in their individual capacities, *see* footnote 16, *supra*, the Court recommends, insofar as equivalent claims have been asserted against Greenwood, that they too be dismissed.

27    Even if Plaintiffs' claims against the SCDA were to be construed as against the State, *see Ying Jing Gan*, 996 F.2d at 536, the Court would still recommend that they be dismissed for the reasons set forth in sections III(B)(1)(a)-(c), *supra*.

28    Because this Court concludes that no viable claim predicated on the actions of Greenwood or the SCDA can lie against the County, it does not reach the question of potential municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and *Jett* arising from a practice or custom. Further, as the preceding analysis of Plaintiffs' claims for declaratory relief against the State Defendants, *see, e.g.*, sections III(B)(1)(a)-(c), *supra*, applies equally to the County Defendants, the Court need not address the County Defendants' argument that Plaintiffs have failed to allege sufficient real or immediate harm to pursue a claim under the Declaratory Judgment Act.

29    Although it is conceivable that Plaintiffs could plead additional facts demonstrating bad faith or harassment such that *Younger* would no longer bar Silva's claims for declaratory and injunctive relief, leave to amend those claims would nevertheless be futile considering this Court's findings with respect to Eleventh Amendment immunity.

30    The Court has reviewed the State Defendants' qualified immunity argument, but deems it premature to address given the recommendation herein that leave to amend the statutory claims against Farrish, Laczi and Seggos in their individual capacities be granted.

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 624081
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jason R. WHITE, Plaintiff,

v.

Brian FISCHER, Commissioner, Dept.
of Correctional Services; Theresa A.
Knapp–David, Director, Classification and
Movement; and R. Woods, Superintendent,
Upstate Correctional Facility, Defendants.

No. 9:09–CV–240.
|
Feb. 18, 2010.

**Attorneys and Law Firms**

Jason R. White, Elmira, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State
of New York, Brian J. O'Donnell, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Jason R. White, commenced this civil rights
action in February 2009, pursuant to 42 U.S.C. § 1983.
By Report–Recommendation dated January 25, 2009, the
Honorable David E. Peebles, United States Magistrate
Judge, recommended that defendant's motion to dismiss
(Dkt. No. 10) be granted, and that plaintiff's complaint
in this action be dismissed without leave to replead. No
objections to the Report–Recommendation have been
filed.

Based upon a careful review of the entire file and
the recommendations of Magistrate Judge Peebles, the
Report–Recommendation is accepted and adopted in all
respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendant's motion to dismiss (Dkt. No. 10) is
GRANTED;

2. Plaintiff's complaint in this action is DISMISSED
without leave to replead; and

3. The Clerk is directed to file judgment accordingly and
close the file.

IT IS SO ORDERED.

JASON R. WHITE,

Plaintiff,

-v.-

BRIAN FISCHER, THERESA A. KNAPP–DAVID,
and R. WOODS,

Defendants.

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Jason R. White, a New York State prison
inmate who is proceeding *pro se* and *in forma pauperis,*
has commenced this action pursuant to 42 U.S.C. §
1983, alleging deprivation of his civil rights. In his
complaint, plaintiff asserts that his transfer into special
housing unit ("SHU") disciplinary confinement at the
Upstate Correctional Facility, to serve what was originally
intended to be a three-month disciplinary sentence of less
restrictive keeplock confinement imposed while at another
facility, represented a deprivation of a liberty interest
without the requisite procedural due process. As relief
for the violation, plaintiff's complaint seeks an award of
compensatory damages in the amount of $25,000.

In response to plaintiff's complaint, defendants have
moved seeking its dismissal for failure to state a cause
of action upon which relief may be granted. In their
motion, defendants argue that plaintiff's allegations do
not demonstrate the existence of a meritorious due process
claim since, at best, it implicates a failure of prison officials
to comply with governing regulations regarding transfers
into an SHU unit, a matter not of constitutional concern,
noting further that plaintiff has no constitutional right
to be designated to a particular correctional facility or

to a desired security classification. Defendants also seek dismissal of plaintiff's claims against them based upon lack of personal involvement, and additionally assert their entitlement to qualified immunity from suit as a basis for their dismissal motion.

For the reasons set forth below, I find that White's complaint fails to set forth a plausible due process violation and that defendant Fischer is also entitled to dismissal of the claims against him based upon the lack of allegations showing of his personal involvement in the conduct allegedly giving rise to plaintiff's claims. I further recommend a finding that, even if plaintiff were able to plead a cognizable due process cause of action, defendants Knapp–David and Woods nonetheless should be granted qualified immunity from suit in this instance.

## I. *BACKGROUND* [1]

 **\*2** Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Complaint (Dkt. No. 1). At the times relevant to his claims plaintiff was designated first to the Auburn Correctional Facility ("Auburn"), located in Auburn, New York, and later to the Upstate Correctional Facility ("Upstate"), located in Malone, New York. *Id.,* § 6.

On March 28, 2007, while confined at Auburn, plaintiff was found guilty following a Tier I II disciplinary hearing of engaging in violent conduct and refusing a direct order, in violation of disciplinary rules 104.11 and 106.10, respectively. [2] *See* Plaintiff's Memorandum (Dkt. No. 1–1) Exh. A. [3] As a result of that determination plaintiff was sentenced to serve three months of keeplock confinement, with a corresponding loss of package, commissary, and telephone privileges. *See id.*

On April 11, 2007, while serving his keeplock sentence at Auburn, White was processed out of that facility and, following completion of an inter-prison transfer process which included a stop at another facility, was transferred into Upstate on or about April 13, 2007. Complaint (Dkt. No. 1) § 6. At Upstate, plaintiff was assigned to a two-person cell in the facility's SHU to serve the balance of his disciplinary confinement sentence. [4] *Id.*

On April 23, 2007 plaintiff filed a grievance with prison authorities, arguing that his transfer into the SHU

at Upstate was not authorized by DOCS directives. Complaint (Dkt. No. 1) § 6 at p. 4B; Plaintiff's Memorandum (Dkt. No. 1–1) Exh. C. The grievance was denied by the facility's Inmate Grievance Review Committee ("IGRC"). Complaint (Dkt. No. 1) § 6 at p. 4B; Plaintiff's Memorandum (Dkt. No. 1–1) Exh. D. Plaintiff appealed the denial to defendant Woods, the Superintendent at Upstate, who upheld the IGRC's unfavorable determination by decision dated May 15, 2007. Complaint (Dkt. No. 1) § 6 at p. 4B. Plaintiff's Memorandum (Dkt. No. 1–1) Exh. D. Plaintiff's further appeal of the matter to the DOCS Central Office Review Committee ("CORC") was likewise unsuccessful. *Id.* Exh. E.

Also on April 23, 2007, plaintiff sent a letter to the DOCS Commissioner Brian Fischer, complaining of the SHU designation. Plaintiff's Memorandum (Dkt. No. 1–1) Exh. F. That letter was referred by Commissioner Fischer to defendant Theresa A. Knapp–David, the DOCS Director of Classification and Movement. Complaint (Dkt. No. 1) § 6 at pp. 4B–4C. In response, defendant Knapp–David wrote to the plaintiff on May 7, 2007, advising that his SHU assignment was in accordance with established DOCS procedures. Plaintiff's Memorandum at (Dkt. No. 1.1) Exh. G.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on February 27, 2009, and was thereafter granted leave to proceed *in forma pauperis.* Dkt. Nos. 1, 4. Named as defendants in plaintiff's complaint are Commissioner Fischer; Director Knapp–David; and Upstate Superintendent R. Woods. Complaint (Dkt. No. 1) § 3. Plaintiff's complaint asserts a single cause of action for deprivation of procedural due process. *Id.,* § 7.

 **\*3** Following service, in lieu of answering plaintiff's complaint, defendants filed a motion to dismiss asserting a variety of grounds for the relief sought. Dkt. No. 10. In their motion defendants argue, *inter alia,* that plaintiff's complaint 1) does not implicate a cognizable due process violation, 2) plaintiff's complaint fails to establish their personal involvement in the deprivation alleged; and 3) in any event they are entitled to qualified immunity. [5] Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 13, which is now fully briefed and ripe for determination, and has been referred to me for the

issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Dismissal Motion Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* –––U.S. ––––, 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570 127 S.Ct. at 1974). When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200 (2007) (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976) (internal quotations omitted)).

### B. *Procedural Due Process*

**\*4** In their motion, defendants assert that because plaintiff's due process claim rests on alleged violations of DOCS regulations, his complaint in fact fails to assert a cognizable due process claim.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 260 F.3d 69, 79–80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). Inmates' liberty interests may arise out of the Due Process Clause of the Fourteenth Amendment, or state statute or regulation. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908 (1989)).

Recognizing that lawful imprisonment necessarily restricts the rights and privileges of inmates, the Supreme Court has narrowly circumscribed the scope of liberty interests arising out of the Due Process clause to protect only the most basic liberty interests of prisoners. *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 869 (1983). Accordingly, the Due Process Clause does not guard against every change in the conditions of confinement having a substantial adverse impact on inmates, but only those conditions or restraints that "exceed[ ] the sentence in ... an unexpected manner." *Arce,* 139 F.3d at 333 (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 2300 (1995)).

In this instance plaintiff does not claim that he was denied procedural due process in connection with the disciplinary hearing that led to the imposition of a three-month period of keeplock confinement as a sanction. Instead, he argues that his due process rights were abridged after the sanction was imposed when, in violation of DOCS Directive No. 4933, [6] he was transferred from keeplock confinement at Auburn to an SHU cell at Upstate, and as a result required to endure a more restrictive confinement. Unfortunately for plaintiff, neither the Due Process Clause nor state statute or regulation give rise to a liberty interest in these circumstances.

Preliminarily, it is well recognized that an inmate has no constitutional right to be incarcerated at a particular correctional facility, "and transfers among facilities do not need to be proceeded by any particular due process procedure." *Halloway v. Goord,* No. 9:03–CV01524, 2007 WL 2789499, at * 5 (N.D.N.Y. Sept. 24, 2007) (Kahn, J. and Treece, J.) [7] (citing *Wilkinson v. Austin,* 545 U.S. 209, 221–22 (2005)) (other citation omitted); *see also, Johnson v. Rowley,* 569 F.3d 40, 43 (2d Cir.2009) (per curiam); *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998). As a result, the constitution did not present any impediment to plaintiff's transfer to Upstate.

**\*5** Additionally, it is equally well established, as defendants now argue, that state regulations, including DOCS Directives, do not ordinarily confer constitutional rights sufficient to give rise to a due process claim. *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citing *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009). A state can, however, by statute or regulation confer a liberty interest which cannot be abridged without due process. *Black v. Lansberg,* No. 9:06–CV–1243, 2009 WL 3181111, at *3 (Sept. 29, 2009) (Suddaby, J., adopting Report and Recommendation of Lowe, M.J.). Nonetheless, contrary to plaintiff's contention, DOCS Directive No. 4933 does not give rise to a cognizable liberty interest.

It should be noted that on at least four separate occasions, addressing the same issues raised by the plaintiff in this case, this court has held that an inmate's transfer from keeplock to SHU after being sentenced to serve time in keeplock does not implicate a cognizable liberty interest. *McEachin v. Goord,* No. 9:06–CV–1192, 2008 WL 1788440 (N.D.N.Y. Apr. 17, 2008) (Hurd, J. and Treece, M.J.) (dismissing complaint alleging that plaintiff was unlawfully transferred from keeplock to SHU while serving disciplinary sentence); *Halloway,* 2007 WL 2789499 (granting summary judgment dismissing claim that plaintiff should have received hearing before transfer to Upstate after sentenced to keeplock at Elmira Correctional Facility); *Carlisle v. Goord,* No. 9:03–CV–296, 2007 WL 2769566, at *2 n. 1 (N.D.N.Y. Sept. 21, 2007) (Scullin, S.J., adopting Report and Recommendation of Lowe, M.J.) (granting summary judgment finding that "an inmate has no liberty interest in not having his sentence of keeplock confinement at one prison converted to a sentence of SHU confinement at another facility without receiving a hearing regarding

the conversion."); and, *Chavis v. Kienert,* 9:03–CV–0039, 2005 WL 2452150, at *9–10 (N.D.N.Y. Sept. 30, 2005) (Scullin, C.J.) (finding that transfer from keeplock at Coxsackie Correctional Facility to SHU at Upstate did not implicate a liberty interest). *See also, Holmes v. Grant,* No. 03–Civ. 3426, 2006 WL 851753, at *18–19 (S.D.N.Y. mar. 31, 2006 (dismissing claim plaintiff's claim that disciplinary sentence was improperly converted from keeplock sentence to SHU). These decisions are premised upon the court's conclusion that a transfer from keeplock in one facility to SHU in another does not implicate a constitutionally protected liberty interest and that "New York has not created, by regulation or statute, any liberty interest in remaining in one particular prison[,]" noting that "the DOCS ... possesses sole discretion to determine 'where a [state] inmate will be housed.' " *Halloway,* 2007 WL 2789499, at *5 (quoting *Grullon v. Reid,* No. 97 CIV. 7616, 1999 WL 436457, at *10 (S.D.N.Y. Jun. 24, 1999)) (other citations omitted). These cases are indistinguishable from the case presently before the court.

**\*6** Moreover, contrary to the interpretation offered by the plaintiff, the court has read section 301.6 of DOCS Directive No. 4933 as "explicitly permitt[ing] keeplock sentences to be served in SHU and subject to the same restrictions and amenities ...." *McEachin,* 2008 WL 1788440, at *4; *see also, Halloway,* 2007 WL 2789499, at * 5 ("[N]ot only do New York State Regulations permit keeplock sentences to be served in SHU, but further contemplate that assignments to SHU will be subject to the same ... limitations.") and *Holmes,* 2006 WL 851753, at * 19 ("Section 301.6 ... relat[es] to keeplock admissions and authorizes placement of inmates in SHU 'at a medium or minimum security correctional facility or *Upstate Correctional Facility* ... for confinement pursuant to disposition of a disciplinary (Tier II) or superintendent's (Tier II hearing.' ") (emphasis in original).

In view of the foregoing, it is clear that plaintiff's transfer from Auburn, where he was keeplocked, to SHU confinement at Upstate does not implicate a liberty interest arising out of either Due Process Clause, or state statute or regulation. According to plaintiff's complaint, he was sentenced to keeplock after a Tier III disciplinary hearing; he does not allege that he was denied due process in connection with that hearing. The Tier II I hearing that he was provided was all that was required by the constitution before he was sentenced to disciplinary confinement. *Holmes,* 2006 WL 851753, at *19. Plaintiff

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

was entitled to no further procedure at the time of transfer to Upstate, and therefore cannot show that he was deprived of a protected liberty interest without due process of law.[8] *Id.* Accordingly, I recommend that plaintiff's complaint be dismissed for failure to state a cause of action.

### C. *Personal Involvement*

In their motion, defendants also challenge the sufficiency of plaintiff's allegations regarding their personal involvement in the constitutional deprivations alleged. Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir.1991)* and *McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977), cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Two of the three defendants, Brian Fischer and Robert Woods, appear to be named as defendants in their supervisory capacities, based solely upon their positions as the DOCS Commissioner and the Superintendent at Upstate, respectively. As supervisors, neither of those individuals can be liable for damages under section 1983 solely by virtue of their respective positions as supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v.. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."). Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the

wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds, sub nom., Ashcroft v. Iqbal,* ——U.S. ——, 129 S.Ct. 1937.; *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).

#### 1. *Commissioner Fischer*

**\*7** Aside from allegations centering upon his role as the DOCS Commissioner, which are clearly insufficient in and of themselves to establish his liability, plaintiff's claims against defendant Fischer appear to revolve around the letter written by him to the Commissioner on or about April 23, 2007, complaining of his SHU confinement at Upstate. That letter, it appears from the limited materials now before the court, was referred to defendant Knapp–David for response. It is well established that when the Commissioner receives a letter and forwards it on to another individual for investigation and a response, his or her involvement in the constitutional violation cannot be predicated solely upon those circumstances. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *Rivera v. Fischer,* No. 08–CV–6505L, 2009 WL 2981876, at *2 (W.D.N.Y. Sept. 18, 2009). I therefore recommend dismissal of plaintiff's claims against Commissioner Fischer on the basis of lack of his personal involvement.

#### 2. *Superintendent Woods*

Plaintiff's claims against Superintendent Woods stand on slightly different footing. It is alleged that Superintendent Woods processed and affirmed the determination of the Upstate IGRC denying plaintiff's grievance regarding the relevant occurrences. His review of plaintiff's grievance arguably placed Superintendent Woods on notice of a constitutional violation, which was ongoing, at a time when he was potentially positioned to end the violation. On that basis I conclude that plaintiff has sufficiently alleged Superintendent Woods' personal involvement in the violation alleged to withstand defendants' dismissal motion. *See Charles v. New York State Dept. of Corr. Services,* No. 9:07–CV–1274, 2009 WL 890548, at *5–9 (N.D.N.Y. Mar. 21, 2009) (Hurd, J. and DiBianco, M.J.).

### 3. *Director Knapp–David*

Plaintiff's complaint alleges that in her position as the DOCS Director of Classification and Movement, defendant Knapp–David would have reviewed and approved his transfer from Auburn into Upstate. That allegation is buttressed by both her position with the DOCS and the fact that plaintiff's letter regarding the matter was referred to defendant Knapp–David for response explaining why the transfer was proper under DOCS regulations. On this basis, I conclude that plaintiff has stated a plausible claim against defendant Knapp–David and her personal involvement in the constitutional deprivations alleged.

### D. *Qualified Immunity*

In their motion, defendants also assert entitlement to qualified immunity from suit. Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ——, 129 S.Ct. 808, 815 (2009).

**\*8** In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. ——, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[9] *Kelsey,* 567 F.3d at 61, "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[10] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently concluded in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[11] *Pearson,* 555 U.S. ——, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official

would have understood that his or her acts were unlawful.

**\*9** *Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994) (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v.. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995)).

Applying the *Saucier* two-step inquiry here, I have already determined that plaintiff has failed to state a plausible constitutional violation. Moreover, even if plaintiff were able to distinguish the existing precedent in this district and allege a protected liberty interest that required that plaintiff be provided with additional due process before his transfer to Upstate, I conclude that any such right was far from a clearly established and that a reasonable person in the circumstances of defendant Woods and defendant Knapp–David would not have appreciated that the transfer of plaintiff into SHU confinement at Upstate represented a potential deprivation of plaintiff's procedural due process rights beyond those addressed by the hearing officer. Accordingly, as an additional basis for dismissal, I recommend that both defendants Woods and Knapp–David be granted qualified immunity from suit.

IV. *SUMMARY AND RECOMMENDATION*
At the heart of plaintiff's complaint in this action is his contention that his due process rights and DOCS regulations were violated when he was transferred from keeplock confinement at Auburn into an SHU cell at Upstate. Since such a claim, it is well established in this district, is not constitutionally cognizable, White has therefore failed to state a claim upon which relief may be granted. While plaintiff has failed to establish personal involvement on the part of Commissioner Fischer in an alleged deprivation and the claims against him should be dismissed on this additional basis, plaintiff has sufficiently alleged personal involvement on the part of defendant Knapp–David and R. Woods. Nonetheless, I find that those two defendants are entitled to qualified immunity from suit, providing an additional basis for dismissal of plaintiff's claims against them. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 10) be GRANTED, and that plaintiff's complaint in this action be DISMISSED, without leave to replead; and it is further

ORDERED that pending a final determination on defendants' dismissal motion, discovery in this action be and hereby is STAYED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

**\*10** It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 624081

Footnotes

1    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the
     contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S.
     89, 127 S.Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007)); *see
     also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964). I have also considered the exhibits attached to

plaintiff's memorandum, which accompanied his complaint, to the extent that they are consistent with the allegations of his complaint. *See Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.).

2    The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

3    Plaintiff filed what he labeled as a "memorandum of law", with exhibits attached, in conjunction with his complaint. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his ... memorandum." *Rivera v. Selsky,* No. 9:05–CV–0967, 2007 WL 956998, at *1 n. 2 (N.D.N.Y. Jan. 5, 2007) (quoting *Gadson v. Goord,* 96 Civ. 7544, 1997 WL 714878, at *1 n. 2 (S.D.N.Y. Nov. 17, 1997)).

4    Upstate is a maximum security prison comprised exclusively of SHU cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

5    Defendant's also seek a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure staying discovery in this matter pending final determination of their dismissal motion. Discerning no basis to conclude that plaintiff would be unduly prejudiced by such a stay, that application will be granted.

6    Section 301.6(a) of DOCS Directive No. 4933 permits an inmate confined in a medium or minimum security facility, or at Upstate, to be admitted into an SHU for various reasons, which can include confinement pursuant to a Tier II or III hearing disposition. Plaintiff asserts that because he was transferred from Auburn, a maximum security facility, into an SHU unit, that section does not apply. Interestingly, a prior version of DOCS Directive No. 4933 provided, in relevant part, that

[a]n inmate who is assigned to keeplock status and who is transferred to a maximum security facility shall not be assigned to the special housing unit at the receiving facility. Such inmate shall be assigned to keeplock within general population and shall have the same rights and responsibilities as other keeplock inmate in that facility.

*Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998) (quoting prior version of 7 NYCRR § 301.6(h)).

7    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

8    Plaintiff alleges a litany of differences between the conditions experienced while in keeplock at Auburn and those in SHU at Upstate asserting, for example, that with regard to visits, he was required to travel to and from them in handcuffs, had to remain in handcuffs if he needed to use the restroom, and was not permitted to take photographs, and also that he did not have the same opportunities for social interaction with other prisoners and had to sleep with a light on. Plaintiff's Memorandum (Dkt.1–1) at pp. 11–12. As a matter of law, these alleged conditions can hardly be characterized as "exceed[ing] his sentence in an unexpected manner" or as imposing an "atypical and substantial hardship upon the [plaintiff] in relation to the ordinary incidents of prison life". *Sandin,* 515 U.S. at 484, 115 S.Ct. at 2300. "[T] fact that 'life in one prison is much more disagreeable than another does not itself signify that a Fourteenth Amendment liberty interest is implicated...." *Halloway,* 2007 WL 2789499, at *7 (quoting *Meachum v. Fano,* 427 U.S. 215, 225 (1976). Moreover, even if a liberty interest were alleged, plaintiff was afforded all the process he was due, by way of a disciplinary proceeding, before the alleged deprivation. *Carlisle,* 2007 WL 2769566, at *3.

9    If no constitutional right would have been violated were the allegations established, no further inquiry regarding qualified immunity is necessary. *Kelsey,* 567 F.3d at 61 (quoting *Saucier* ).

10    In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433 n. 1 (citation omitted).

11    Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* ––– U.S. ––––, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524 (1991) (per curiam)).

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.